John Michael HUMANIK, Jr., Appellant

v.

Howard BEYER, Warden.

No. 88-5098.

United States Court of Appeals, Third Circuit.

Argued Oct. 20, 1988.

Decided March 31, 1989.

Joel I. Rachmiel (argued), Springfield, N.J., for appellant.

W. Cary Edwards, Atty. Gen. of New Jersey, Richard J. Hughes Justice Complex, Linda K. Calloway (argued), Deputy Atty. Gen., Div. of Crim. Justice, Appellate Section, Trenton, N.J., for appellee.

Before STAPLETON, SCIRICA and COWEN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

We are asked in this habeas corpus proceeding to consider the constitutionality of New Jersey's so-called "diminished capacity" statute, N.J.Stat.Ann. § 2C:4-2, which requires that the defendant bear the burden of proving by a preponderance of the evidence the existence of a mental disease or defect "which would negate a state of mind which is an element of the offense." The district court held that neither the statute nor the instructions to the jury in the petitioner's case violated the petitioner's due process right to have the state prove each and every element of the crime charged beyond a reasonable doubt. We conclude, however, that the trial court's charge did not conform to the dictates of due process. Moreover, we also conclude that the constitutional problem in this case arises not only from the particular approach taken by the trial court in its instructions but also from the diminished capacity statute itself.

### I.

The facts surrounding the crime for which the petitioner, John Humanik, was convicted are essentially uncontroverted. *See State v. Humanik*, 199 N.J.Super. 283, 489 A.2d 691 (Ct.App.Div.), *certif. denied*, 101 N.J. 266, 501 A.2d 934 (1985). On June 4, 1982, Humanik was sentenced to a term of life imprisonment, and ordered to serve 25 years without being eligible for parole, for the murder of his former girlfriend of three years, Lisa Ann Guzzo. He became involved with Ms. Guzzo in 1978, when he was 17 and she was just 13, and had over the course of their relationship developed a strong attachment to the entire Guzzo family, referring to victim's mother as "mom" and frequently staying at the Guzzo family home. This attachment was attributed, at least in part, to Humanik's emotionally deprived upbringing, having been abandoned by his mother and having spent an extended period of time in a foster home before eventually being raised by an aunt.

The sequence of events leading to the murder began on August 5, 1981, when Ms. Guzzo told Humanik that she wanted to end the relationship and date another man. Over the next several days, Humanik made repeated attempts to convince Ms. Guzzo not to leave him, but was unsuccessful. On August 11, the evening of the murder, after procuring his uncle's gun a few days earlier and purchasing the necessary ammunition, Humanik went to the Guzzo's home, ostensibly to determine the identity of her new boyfriend. Humanik entered the home and at gunpoint ordered Ms. Guzzo's sister and new boyfriend who were also in the house to be seated while he spent several hours trying to persuade Ms. Guzzo to take him back.

At 11:30 p.m., upon the return home of the victim's parents, Humanik pointed the gun at Ms. Guzzo and fired the fatal shot. He immediately fled from the scene of the shooting, traveling to New York, North Carolina, Florida, and ultimately Las Vegas where he eventually was apprehended approximately two months later.

At trial, Humanik conceded that he shot and killed Ms. Guzzo at her family home. The sole contested issue was Humanik's state of mind at the time of the shooting. His defense was that he did not intend to kill Ms. Guzzo and therefore lacked the requisite *mens rea* for murder.[1] More spe-

---

**1.** Murder is defined under the New Jersey Code    in pertinent part:

cifically, Humanik contended that he suffered from a mental disease or defect that deprived him at the time of the shooting of the capacity to formulate an intent to kill Ms. Guzzo. This line of defense implicated New Jersey's "diminished capacity" statute which provides as follows:

> 2C:4–2 Evidence of mental disease or defect admissible when relevant to element of the offense
>
> Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. *Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.*

N.J.Stat.Ann. § 2C:4–2 (emphasis supplied). In the alternative, Humanik also claimed that the shooting was accidental.

In the interest of avoiding confusion, we digress at this point from our account of the facts and procedural history of this matter to note that the phrase "diminished capacity," while widely used in this context, does not accurately describe the content of the statute. As the text indicates, the defense referred to is relevant only when the disease or defect "negates," that is renders one *wholly without capacity* to have, the particular state of mind required as an element of the offense. The potential for confusion is exacerbated further by the fact that the phrase "diminished capacity" can evoke notions of diminished culpability associated with defenses that excuse or justify conduct that fully satisfies all elements of the offense charged, as for example, the defenses of insanity and self-defense.

Humanik relied on the opinion of two experts as the basis for his defense; Dr. Seymour Kuvin testified that Humanik suffered from Borderline Personality Disorder, app. at 161, and Carl Einhorn, Ph.D., diagnosed Humanik's psychology as "schizo-affected psychosis." App. at 165. Both experts expressed the opinion that Humanik did not act knowingly or purposely in killing Guzzo. App. at 18. In rebuttal, the state offered two expert witnesses. John P. Motley, M.D., and Alvin Krass, Ph.D., agreed that Humanik suffered from a personality disorder, but nevertheless opined that it did not affect his ability to perform acts knowingly or purposely. App. at 18, 154, 155.

In the face of the conflicting expert testimony, the central issue at trial, which remains of principal importance in this proceeding, concerned which party bore the burden of persuasion on the issue of Humanik's purported inability to formulate purpose or intent. Humanik presented the trial court with two separate theories why requiring the defendant to prove a "mental disease or defect which would negate a state of mind which is an element of the offense," as suggested by the language of the statute, violated the Constitution.

First, he noted that the statute's last sentence, which explicitly places the burden of proof on the defendant, did not become effective until September 24, 1981. *See* L.1981, c. 290, § 8 (effective Sept. 24, 1981). Although Humanik was tried after the effective date, in June of 1982, he

---

a. Except as provided in section 2C:11–4 criminal homicide constitutes murder when:
(1) The actor purposely causes the death or serious bodily injury resulting in death; or
(2) The actor knowingly causes death or serious bodily injury resulting in death; ... N.J.Stat.Ann. § 2C:11–3. The terms "purposely" and "knowingly" are defined as follows:
(1) *Purposely.* A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist....
(2) *Knowingly.* A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. N.J.Stat.Ann. § 2C:2–2b(1) & (2).

nevertheless committed the crime before September 24, 1981, on August 11, 1981. As such, according to Humanik, because the change in law was substantive, not merely procedural, and additionally because it disadvantaged him, applying the 1981 amendatory language in his case would violate the prohibitions of the Constitution's *ex post facto* clause.

Second, he claimed that, in any event, by placing the burden on the accused to prove a mental disease or defect defense by a preponderance of the evidence, the statute violates the due process requirement that the state must prove each element of the crime charged beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 323 (1970). Humanik argued that a mental disease or defect defense, unlike other exculpating defenses such as insanity or self-defense which serve to excuse or justify a crime, operates solely to negative the state of mind which is an element of the offense. Accordingly, the only burden which can constitutionally be placed on the accused with respect to such a defense is the burden to come forward with competent evidence of mental disease or defect. Once the accused satisfies that obligation, the issue of mental disease or defect is one for the jury and the state must shoulder the burden of disproving beyond a reasonable doubt either the existence of the disease or defect or its incapacitating effect at the time of the alleged crime.

The trial court disagreed, concluding that it was constitutionally permissible to place the burden of proving diminished capacity on the defendant. It charged the jury in pertinent part as follows:

> In connection with the question of the defendant's mental state at the time in question, since the defendant has raised this defense, that is, the defense that *he had a mental disease or defect at that time which prevented him from having the state of mind the law says he would have to have,* that is, a knowing or purposeful mental state in connection with the killing, he has the burden to prove that he had *such* mental defect or disease by a preponderance of the evidence.

App. at 210 (emphasis supplied). The jurors returned a verdict convicting Humanik of purposeful and knowing murder. App. at 8.

Humanik appealed his conviction to the New Jersey Superior Court, Appellate Division, arguing *inter alia* that the trial court erred in its burden of proof instruction. The court upheld the conviction. It reasoned that requiring Humanik to establish the defense by a preponderance of the evidence did not implicate the prohibition against *ex post facto* laws because, "[a]lthough N.J.S.A. 2C:4-2 was originally silent with respect to the burden of proving mental impairment, the amendment did not change the law in that respect." *State v. Humanik,* 199 N.J.Super. 283, 489 A.2d 691, 702 (App.Div., 1985). The court also rejected Humanik's due process challenge, holding that "the legislature can constitutionally compel the defense to rebut the assumption of mental normalcy as long as the prosecution bears the burden of establishing the requisite state of criminal culpability beyond a reasonable doubt ... the trial judge's instructions clearly apprised the jury of the State's obligation in that regard." *Id.* 489 A.2d at 699–700. By order dated May 16, 1985, the Supreme Court of New Jersey denied certification, thus exhausting Humanik's state remedies.

On November 14, 1985, Humanik petitioned the district court for a writ of habeas corpus. That court found no constitutional violation in the state court proceedings, reasoning that even if placing the burden of proof on the defendant violated the *ex post facto* clause, any error in this regard had to be considered harmless beyond a reasonable doubt on the entire record. Furthermore, it concluded that the state's burden of proving each element of the crime charged was not shifted to the defendant in this case.

This court granted Humanik's request for a certificate of probable cause to appeal. Our standard of review of a district court's conclusions of law with respect to a state prisoner's petition for a writ of habeas corpus is plenary. *See, e.g., Carter v.*

*Rafferty,* 826 F.2d 1299, 1304 (3d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988).

## II.

■ Humanik presses both his due process and *ex post facto* claims in this appeal. We turn first to the *ex post facto* issue. If the 1981 amendment to § 2C:4–2 cannot constitutionally be applied to Humanik's case, it would be unnecessary for us to address the constitutionality of the statute as amended. We conclude, however, that application of the amendment in Humanik's trial was consistent with the *ex post facto* clause.

The United States Supreme Court has repeatedly declared that, in a federal habeas proceeding such as this, "state courts are the ultimate expositors of state law ... and we are bound by their constructions except in rare circumstances." *Mullaney v. Wilber,* 421 U.S. 684, 691, 95 S.Ct. 1881, 1886, 44 L.Ed.2d 508 (1975). In this case, the Appellate Division of the New Jersey Superior Court, *State v. Humanik,* 199 N.J.Super. 283, 489 A.2d 691 (App.Div. 1985), concluded that the 1981 statutory amendment to § 2C:4–2 did not change existing law relative to the defendant's burden of proving mental disease or defect. That conclusion is a reasonable one based on the preexisting case law and, accordingly, we hold that it is dispositive of the *ex post facto* issue.

In reaching its decision, the Appellate Division relied principally on the New Jersey Supreme Court precedent of *State v. Molnar,* 81 N.J. 475, 410 A.2d 37 (1980), which was decided well before the alleged crime was committed in this case. The court read *Molnar* to hold that under New Jersey law a defendant who contended that a mental defect deprived him of the capacity to have the state of mind necessary for commission of the offense was required "to prove the existence of a mental defect, there amnesia, by a preponderance of the evidence," *id.* 421 U.S. at 701–702, 95 S.Ct. at 1891, even though the state retained the burden of proving the required state of mind beyond a reasonable doubt. The Ap-

pellate Division further construed *Molnar* as upholding the constitutionality of this practice. We find this understanding of *Molnar* to be a reasonable one. Indeed, we believe *Molnar* can only be read as announcing a rule of law consistent with the New Jersey Supreme Court's interpretation of § 2C:4–2 as amended in 1981. Since the addition of the final sentence of that section did not alter the law regarding allocation of the burden of proof as it existed at the date of the alleged crime, the trial court's invocation of the statute did not violate the *ex post facto* clause of the Constitution.

## III.

We now turn to the more difficult, due process issue. In order to resolve it, we must briefly review the seminal Supreme Court precedents which address the constitutionality of requiring the accused to bear the burden of persuasion with respect to affirmative defenses. We must also review the New Jersey case law interpreting the diminished capacity statute at issue here.

## A.

In *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 323 (1970), the Supreme Court addressed the constitutionality of a provision of the New York Family Court Act which allowed a juvenile to be declared a juvenile delinquent based upon a preponderance of the evidence presented. A juvenile delinquent was defined as a juvenile who did an act which, if done by an adult, would constitute a crime. The Supreme Court declared that "the Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364, 90 S.Ct. at 1073. In the words of Justice Harlan, this conclusion was "bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *Id.* at 372, 90 S.Ct. at 1076 (Harlan, J., concurring). *See also Speiser*

*v. Randall,* 357 U.S. 513, 525–526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958) ("There is always in litigation a margin of error ... Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden ... of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt.")

In *Mullaney v. Wilber,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Court applied the *Winship* principle in the context of an affirmative defense. At issue in *Mullaney* was a Maine rule that required a defendant charged with murder to prove that he acted "in the heat of passion on sudden provocation" for the homicide to be reduced to manslaughter. 421 U.S. at 686, 95 S.Ct. at 1883. Under the law of Maine, murder was defined as the unlawful killing of a human being "with malice aforethought, either express or implied." *Id.* The state was required to prove that the homicide was unlawful and intentional beyond a reasonable doubt in order to convict the defendant of either murder or manslaughter. Nevertheless, the jury was instructed that "if the state proved the homicide was intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation." *Id.*

The Supreme Court held that Maine's presumption unconstitutionally shifted to the defendant the burden of proving an element of the crime charged. The Court recognized that, by requiring the defendant "to prove the critical fact in dispute," *id.* at 701, 95 S.Ct. at 1890, the Maine rule afforded criminal defendants even less protection than the statute at issue in *Winship;* in *Winship* "the ultimate burden of persuasion remained with the prosecution, although the standard had been reduced to proof by a fair preponderance of the evidence," *id.,* whereas Maine's rule affirmatively shifted the burden of proof to the defendant, thus "increase[ing] further the

likelihood of an erroneous murder conviction." *Id.* 421 U.S. at 701, 95 S.Ct. at 1890.

In a concurring opinion, Justice Rehnquist expressed his belief that the Court's earlier decision in *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), upholding a statute which placed the burden of proving insanity on the defendant, remained good law after *Mullaney.* He reasoned that, "although ... evidence relevant to insanity as defined by state law may also be relevant to whether the required *mens rea* was present, the existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime." *Id.* 421 U.S. at 705–706, 95 S.Ct. at 1893 (Rehnquist, J., concurring).

Two years later, in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed. 2d 281 (1977), a majority of the Court adopted Justice Rehnquist's reasoning. *Patterson* involved the affirmative defense of extreme emotional disturbance which, like the defense at issue in *Mullaney,* would reduce the crime of second-degree murder to manslaughter if proved by the accused by a preponderance of the evidence. Despite the factual similarity with *Mullaney,* the Court held that requiring the defendant to prove extreme emotional disturbance was constitutionally permissible because the defense in *Patterson,* unlike in *Mullaney,* did "not serve to negative any facts of the crime which the State is to prove in order to convict of murder. [Rather, it] constitutes a separate issue on which the defendant is required to carry the burden of persuasion." 432 U.S. at 207, 97 S.Ct. at 2325. The Court, thus, refused to read *Mullaney* broadly, declaring:

> We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused ... We therefore will not disturb the balance struck in previous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt

all of the elements included in the definition of the offense of which the defendant is charged. Proof of the non-existence of all affirmative defenses has never been constitutionally required; we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here.

*Id.* at 210, 97 S.Ct. at 2327.

Most recently, in *Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), the Court relied on its reasoning in *Patterson* to sustain an Ohio statute that placed the burden of proving self-defense by a preponderance of the evidence on the accused. The Court reviewed the elements necessary to establish self-defense under Ohio law and found none of these facts present in the definition of the crime of murder for which the defendant had been charged. On that basis, the Court rejected the defendant's due process argument, and reaffirmed the line drawn in *Patterson* with respect to the constitutionality of shifting to the defendant the burden of proving facts that are not elements of the crime charged:

> The State did not exceed its authority in defining the crime of murder as purposely causing the death of another with prior calculation and design. It did not seek to shift to Martin the burden of proving any of those elements, and the jury's verdict reflects that none of her self-defense evidence raised a reasonable doubt about the state's proof that she purposefully killed with prior calculation and design.

480 U.S. at 233, 107 S.Ct. at 1102.

The Supreme Court emphasized in *Martin*, however, that where there is evidence relevant both to an element of the offense charged and to an affirmative defense, the jury must be instructed that the defendant's evidence on the affirmative defense must be considered in determining whether the state has proved all the elements of the offense regardless of whether the defendant has carried his burden of proof with respect to the affirmative defense. The court cautioned:

> It would be quite different if the jury had been instructed that self-defense evidence could not be considered in determining whether there was a reasonable doubt about the state's case, i.e., that self-defense must be put aside for all purposes unless it satisfied the preponderance standard. Such instruction would relieve the state of its burden and plainly run afoul of *Winship*'s mandate. The instructions in this case could be clearer in this respect, but when read as a whole, we think they are adequate to convey to the jury that all of the evidence, including the evidence going to self-defense, must be considered in deciding whether there was a reasonable doubt about the sufficiency of the state's proof of the elements of the crime.

480 U.S. at 233–234, 107 S.Ct. at 1102.

### B.

We now turn to New Jersey's diminished capacity statute, N.J.Stat.Ann. § 2C:4–2. The meaning, scope and constitutionality of § 2C:4–2, have been addressed in two recent New Jersey Supreme Court cases, *State v. Breakiron*, 108 N.J. 591, 532 A.2d 199 (1987), and *State v. Zola*, 112 N.J. 384, 548 A.2d 1022 (1988), both decided after the completion of Humanik's state court proceedings.

In *Breakiron*, the Court, after a comprehensive review of the genesis and history of the statute, concluded that it deals only with evidence of mental disease or defect offered to show that the defendant did not have the mental state required by the statute defining the crime charged; it thus has nothing to do with evidence offered in support of an insanity defense or any other defense tending to show a justification or excuse for conduct that violates the statute at issue. As the Court observed:

> We believe that the diminished capacity defense was designed by the Legislature not as a justification or an excuse, nor as a matter of diminished or partial *responsibility*, but as a factor bearing on the presence or absence of an essential ele-

ment of the crime as designated by the Code.

532 A.2d at 208 (emphasis in original).

The *Breakiron* court found no *Winship* problem, however, because it construed the statute as imposing upon the defendant *only* the burden of proving the existence of a "relevant" mental disease or defect, one that is *capable* of depriving a person of the capacity to achieve the required state of mind. According to the Court, the statute did not impose any burden of persuasion upon the defendant with respect to the distinct issue of whether a mental disease or defect had in fact deprived the defendant of such capacity at the time of the alleged offense. Since the defendant's statutory burden was on an issue distinct from the issue posed by the element of the crime charged, the *Breakiron* Court, relying on cases permitting the burden of proving insanity to be placed on the defendant, found no constitutional infirmity. Thus, it concluded:

> As long as the State remains responsible to prove beyond a reasonable doubt the essential elements of an offense, the Supreme Court has held that it is constitutionally permissible to impose on a defendant the burden of proving an insanity defense that exculpates the defendant. *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).... Whether or not mental disease or defect is established, the State always bears the burden of proving beyond a reasonable doubt the essential mental elements of the crime charged. But the presence or absence of mental disease or defect is not an essential element of the crime as defined by the Legislature....

*Id.* 532 A.2d at 210.

In *Zola*, the New Jersey Supreme Court again recognized that *Winship* would be violated by a statute or charge suggesting that the defendant had the burden of proof in connection with an issue that the state was required to prove as an element of the offense:

> In *Breakiron*, we upheld the constitutionality of the "diminished capacity" statute, N.J.S.A. 2C:4-2, to the extent that it imposes on a defendant the bur-

> den of proving the presence of *a mental disease or defect that has the capacity of negating the culpable mental state that is an essential element of the offense charged....* At the same time, we emphasized that the statute intends no more than it states—i.e., that the defendant need show only that the condition was *present*, not that it in fact negated the culpable mental state. To do otherwise would impermissibly shift to the defendant the burden of disproving an essential element of an offense.

548 A.2d at 1029–1030 (emphasis added). As in *Breakiron*, the Court here found no constitutional problem with the diminished capacity defense because the burden imposed by the statute was on an issue distinct from that which the State was required to prove.

The Court went further in *Zola*, however, and undertook to give concrete guidance to the trial courts of New Jersey concerning the jury instruction to be thereafter given in homicide cases:

> We recognize the continuing debate on the best manner of conveying the diminished capacity defense to the jury. *See* 121 *N.J.L.J.* 453 (March 10, 1988). We believe that the jury's understanding of this offense would be advanced by the suggestion offered before us in the Public Defender's brief. He proposed that in order to meet the constitutional requirement, the court should instruct the jury in words similar to these:

>> The defendant must prove by a preponderance of the evidence that he suffers from a mental disease or defect. However, the prosecution must prove beyond a reasonable doubt that defendant's mental disease or defect did not negate the state of mind which is an element of the crime, that is, purposely or knowingly. In other words, the prosecution must prove beyond a reasonable doubt that defendant acted purposely or knowingly despite his mental disease.

*Id.* 548 A.2d at 1031.

C.

When one attempts to apply *Winship* and its progeny in the context of New

Jersey's diminished capacity statute, it is helpful to distinguish three different situations. First there is the situation like that confronted in *Patterson* and *Martin* in which the ultimate issues posed by one of the elements of the offense and by an "affirmative defense" are different, but nevertheless are such that subsidiary facts are relevant to both issues. This situation typically involves defenses such as insanity and self-defense which excuse or justify the commission of an offense. In such a situation, a state may place the burden of proof on the defendant with respect to the ultimate issue posed by the "affirmative defense." Nevertheless, the charge to the jury must make it clear that the jury can consider the defendants' evidence as it relates to the "element of the crime" issue, which the government has the burden of proof beyond reasonable doubt, regardless of whether the jury believes the defendants' evidence more likely true than not true. Otherwise, a conviction would violate the *Winship* rule that a defendant who creates a reasonable doubt about an element of the offense charged is entitled to an acquittal. The Supreme Court explained this in *Martin*. While it permitted Ohio to place on the defendant the burden of proving the affirmative defense of self-defense by a preponderance of the evidence, it did so only because the instructions as a whole made it clear that all evidence relevant to the "element of the crime" issue had to be considered by the jury in reaching a decision on whether that element had been proved by the state beyond a reasonable doubt.

■ A different and more serious problem is presented in the situation where the element of the offense and the so-called "affirmative defense" pose the same ultimate issue and a state places the burden of persuasion on the defendant with respect to that ultimate issue. In such a situation, the relevance of the subsidiary facts in the case are the same and the sole significance of the defendants' evidence concerning the so-called "affirmative defense" is to create a reasonable doubt about the existence of an element of the offense. In this context, as the Supreme Court of New Jersey rec-

ognized in both *Breakiron* and *Zola,* it is not constitutionally permissible under *Winship* and *Martin* to charge the jury that the defendant has the burden of proving his defense by a preponderance of the evidence. As we recently observed in *United States v. Clemons,* 843 F.2d 741, 752 (3d Cir.1988):

> Merely labelling something an affirmative defense does not mean the statute is constitutional. "[i]t must appear that the so-called defense does not in actuality negate any element of the crime." 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 1.8, at 75 (1986); *see generally Sandstrom,* [*v. State of Montana* ] 442 U.S. [510] at 520, 99 S.Ct. [2450] at 2457 [61 L.Ed.2d 39] [1979]. A defendant may be required to bear the burden of persuasion with respect to defenses such as those showing justification or excuse, but not with respect to those that "negative guilt by cancelling out the existence of some required element of the crime." W. LaFave & A. Scott, *supra,* at 71, 75. Accordingly, in assessing the constitutionality of an affirmative defense, we must inquire whether "the defense is defined in terms of a fact so central to the nature of the offense that, in effect, the prosecution has been freed of the burden" of establishing each constituent element of the crime charged beyond a reasonable doubt. *See id.* § 2.13, at 233; *accord In re Winship,* 397 U.S. at 364, 90 S.Ct. at 1072–73 (prosecution must prove beyond a reasonable doubt every fact necessary to constitute the charged crime.)

In this kind of situation, the constitutional problem is not eliminated by including an instruction in the charge that the state has the ultimate burden of proving every element of the offense beyond a reasonable doubt. When such a standard instruction is coupled with one placing a burden on the defendant to prove his defense by a preponderance of the evidence, the predictable result is more than merely confusion. In order to attribute some significance to the defendants' burden, a rational juror's only option is to conclude that the defendants'

evidence concerning the subject matter of the "affirmative defense" is to be considered only if the jury finds it persuasive, i.e., finds that the facts sought to be proved are more likely true than not true. It is clear from *Martin* that this is constitutionally impermissible.

There is still a third situation illustrated by *Breakiron* and *Zola*. The ultimate issue posed by a diminished capacity defense and the ultimate issue posed by the state of mind element of the offense charged are identical. The New Jersey Supreme Court, however, has interpreted the diminished capacity statute to mean that the defendants' burden of proof by a preponderance of the evidence goes only to the subsidiary issue of whether the defendant had a mental disease or defect of a kind that can deprive a person of the ability to form the requisite state of mind. Nevertheless, the only relevance of that fact is that it is probative with respect to the ultimate issue posed by the state of mind element of the offense charged, i.e., whether the requisite purpose or intent was present at the time of the crime. Thus, in this case, for example, Humanik's expert medical testimony tended to show that he had a disease or defect of the requisite kind but the sole relevance of that fact was whether or not such a disease or defect in fact deprived him of the capacity to formulate intent and purpose on the particular occasion in question. If Humanik did not have such a mental disease or defect, for example, it would follow that such a defect did not deprive him of the capacity to formulate an intent to kill on the day of the shooting. Any charge to be given in a case such as Humanik's must be evaluated with a sensitivity to this dependent relationship between the two factual issues found to be distinct in *Breakiron* and *Zola*, and we believe this relationship distinguishes this case from those, like the insanity defense cases, relied upon by the New Jersey Supreme Court.

**D.**

With this background we turn to the issue of whether the trial court's instruction to the jury in Humanik's trial was consistent with his rights under the due process clause. As we have earlier noted, the trial judge did not yet have the benefit of *Breakiron* and *Zola*. In the absence of such guidance, his instructions to the jury made no attempt to draw a distinction between the subsidiary issue of whether Humanik had a relevant mental disease or defect and the ultimate issue of whether that disease or defect resulted in his having no intent to kill Ms. Guzzo. Rather, as reflected in our previous quote from these instructions, the trial judge expressly told the jury that Humanik had the burden of proving by a preponderance of the evidence that he "had a mental disease or defect at that time [i.e., the time of the alleged crime] which prevented him from having the state of mind the law says he would have to have, that is, a knowing or purposeful mental state in connection with the killing." App. at 210.

We agree with the respondent that a single portion of a charge must not be evaluated in artificial isolation, but rather that the instructions must be viewed in the context of the overall message conveyed to the jury. *See, e.g., Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). Nevertheless, there is nothing else in the charge that in any way dilutes this express instruction that Humanik had the burden of proving by a preponderance of the evidence that he had a mental disease or defect that negated the existence of an intent to kill Ms. Guzzo.

The only portions of the charge relied upon by the respondents are those portions referring to the state's burden of proving each element of the crime charged beyond a reasonable doubt.[2] It is true that these

2. The state of New Jersey also contends that the jury charge in this case was fully consistent with due process in that, unlike *Mullaney*, no essential element of the crime of murder was presumed; the state put forth competent evidence to show that Humanik had the requisite intent to kill and did not rely upon a presumption that the defendant was called upon to rebut. The principles of *Winship* and *Mullaney*, however, are plainly not confined solely to the factual circumstance of where the state *presumes* an essential element of the offense. If this were so,

portions of the instructions when applied in the context of the evidence regarding mental disease or defect and intent directly contradict the court's instruction on the diminished capacity defense. A charge that contradicts a constitutionally impermissible instruction does not cure the problem, however, when there is a reasonable likelihood that a juror may have understood the charge as conveying an unconstitutional message. In *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), the Supreme Court reasoned, after finding an unconstitutional presumption in the trial court's charge to the jury, that a presumption of innocence "boilerplate" instruction did not cure the due process violation:

> The Court today holds that contradictory instructions as to intent—one of which imparts to the jury an unconstitutional understanding of the allocation of burdens of persuasion—create a reasonable likelihood that a juror understood the instructions in an unconstitutional manner, unless other language in the charge *explains* the infirm language sufficiently to eliminate this possibility. If such a reasonable possibility of an unconstitutional understanding exists, we "have no way of knowing that [the defendant] was not convicted on the basis of the unconstitutional instruction." *Sandstrom*, 442 U.S., at 526 [99 S.Ct., at 2460]. For this reason, it has been settled law since *Stromberg v. California*, 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117] (1931), that when there exists a reasonable possibility that the jury relied on an unconstitutional understanding of the law in reaching a guilty verdict, that verdict must be set aside.

*Id.* at 323 n. 7, 105 S.Ct. at 1976 n. 7.

We conclude that there is more than a reasonable likelihood that the jurors in Humanik's case received an unconstitutional understanding of their task. First, we believe it far more likely that the jurors when considering the evidence regarding mental

disease or defect applied the instruction specifically directed to that subject matter rather than the more general charge. More important, as we have earlier suggested, a rational juror attempting to attribute some significance to the instruction on the diminished capacity defense would necessarily conclude that the defendant's evidence should be considered on the intent issue only if the juror finds it to be more likely true than not true. As *Martin* explains, this would be fundamentally at odds with the teaching of *Winship* that a defendant whose evidence raises even a reasonable doubt about an element of the offense charged must be acquitted.

We thus are constrained to disagree with the respondent's contention that the charge, read as a whole, accurately anticipated the teachings of *Breakiron* and *Zola*. Even were we to agree with that contention, however, we would nevertheless be unable to uphold Humanik's conviction. The problem, as we see it, is inherent in the statute even as it has been construed in *Breakiron* and *Zola*. We think this can best be illustrated by an analysis of the effect of the jury instruction expressly approved in *Zola*.

The instruction approved in *Zola* clearly distinguishes between the subsidiary issue of whether the defendant suffers from a disease or defect and the ultimate issue of intent and the effect of any disease or defect thereon. It teaches that the defendant has the burden of persuasion only with respect to the former and that the state has the burden of persuasion with respect to the latter. In any case in which the jury finds it more likely than not that the defendant suffers from a mental disease or defect, we believe this charge provides adequate assurance that the remainder of the jury's deliberations will be consistent with due process. The problem we perceive lies in the fact that a reviewing court will rarely be able to determine whether a jury which convicted the defen-

---

the Court's detailed analysis in both *Patterson* and *Martin* would have been unnecessary inasmuch as neither case involved a challenged presumption per se. An inquiry as to whether or

not there is a presumption that impermissibly shifted the burden of proof to the defendant is unnecessary when the judge's charge expressly directs such a shift.

dant found it more likely than not that he suffered from a relevant mental disease or defect. In the absence of such knowledge, it can only assume that the jury may have concluded that the defendant failed to carry his burden of proof on the issue. In such circumstances, we conclude that the *Zola* charge provides inadequate protection against a due process violation.

In our view, the *Zola* charge invites the jury to address first the subsidiary issue of whether the defendant suffered from a mental disease or defect of the requisite kind.[3] If a jury does so and concludes that the defendant has not met his burden of proof by a preponderance of the evidence, we think there are only two possible meanings that jurors could draw from the proposed instruction. They could conclude either that they should assume that such a disease or defect does not exist or that the diminished capacity issue has been dropped from the case. In either event, when the jury reaches the state of mind issue on which the state has the burden of proof beyond a reasonable doubt, the defendant's evidence concerning the existence of a disease or defect will play no role in their decision. Thus, we believe the proposed charge would have precisely the same effect as the hypothetical charge condemned in *Martin*. As with self-defense evidence, a jury may not be told in this context that the mental disease or defect "evidence must be put aside ... unless it satisfied the preponderance standard." 480 U.S. at 233–34, 107 S.Ct. at 1102. If the defendant's evidence on mental disease or defect is sufficient to raise a reasonable doubt about the existence of the requisite intent, it cannot constitutionally be ignored. If a defendant's evidence creates a reasonable doubt about any element of the offense charged, he must be acquitted.

We stress that *Breakiron* and *Zola* do more than declare that before a jury issue can arise with respect to the existence of a mental disease or defect and the absence of the requisite state of mind as a result thereof, a defendant must come forward with evidence about the existence of such a disease or defect which a reasonable juror could credit. We have no doubt that such a requirement is constitutionally permissible. But in the situation before us, there is no dispute that the defendant has come forward with such evidence. The issue posed by the *Zola* approved charge is whether a state may impose a "preponderance of the evidence" filter which may bar consideration of that evidence by the jury in determining whether the state has proved the requisite state of mind beyond a reasonable doubt. We hold that it may not.

### IV.

Based on the foregoing analysis, we will reverse the judgment of the district court and remand with instructions to enter a judgment in Humanik's favor requiring the State of New Jersey to release him unless he is retried and convicted within a reasonable period.

---

**3.** This distinguishes a case involving the charge approved in *Zola* from the situation before this court in *United States ex rel. Goddard v. Vaughn,* 614 F.2d 929 (3d Cir.1980). *Vaughn* involved a Delaware trial court's instruction in a homicide case that the defendant had the burden of proving an intoxication defense by a preponderance of the evidence. This court concluded that because of the order in which the jury was instructed to address the issues, there was no likelihood of the jury having considered less than all of the defendant's evidence in determining whether the State had proved intent beyond a reasonable doubt:

Only after determining that the prosecution had established its case on first degree mur-

der did the jury have occasion to consider whether the intoxication had been established. This affirmative defense therefore did not lessen the state's burden but added a separate element to the trial so that the defendant would have an opportunity for mitigation. *Id.* at 935.

To the extent that portions of the opinion in *Vaughn* can be read to suggest that a charge may properly place a burden of proof on the defendant with respect to an issue identical to the issue raised by an element of the offense charged, we conclude that any such suggestion cannot survive the analysis of the Supreme Court in *Martin,* as we tacitly recognized last year in our *Clemons* decision.