692 A.2d 981

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JOSEPH
DELIBERO, DEFENDANT–RESPONDENT.

Argued February 3, 1997—Decided May 8, 1997.

*Steven J. Kaflowitz*, Special Deputy Attorney, Assistant Prosecutor, argued the cause for appellant (*Edward M. Neafsey*, Acting Union County Prosecutor, attorney).

*Kevin G. Byrnes*, Designated Counsel, argued the cause for respondent (*Susan L. Reisner*, Public Defender, attorney).

*Deborah C. Bartolomey*, Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Peter G. Verniero*, Attorney General, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This criminal appeal concerns the relationship between a jury charge on diminished capacity and a charge on insanity. Diminished capacity describes a disease or defect of mind that may negate the mental state that is an element of the offense charged.

The insanity defense exculpates an actor from guilt for conduct that would otherwise be criminal. The specific question is whether sequential instructions to the jury that the jury need not consider the evidence of defendant's insanity unless it had first found defendant guilty of an offense precluded the jury from considering whether the evidence of insanity negated the mental states required for conviction.

We hold that a jury instruction should make clear that evidence of insanity may be relevant to the jury's determination of whether the State has proven beyond a reasonable doubt that at the time of the offense the defendant possessed the requisite mental state to convict of the offense charged. We find that the instruction in this case did not prevent the jury from considering the relevant evidence of insanity for that purpose. We reverse the judgment of the Appellate Division and reinstate defendant's conviction.

We adopt the facts of the case generally from defendant's briefs.

I

On the night of June 30, 1991, Armando Guerra confronted an intruder in his parents' Hillside home. The intruder, later identified as defendant Joseph Delibero, was holding a pillowcase. Guerra grabbed the intruder, who then dropped the pillowcase. The two men began to struggle.

Hillside police officers responding to a report of a robbery in progress found Guerra holding defendant in the home's driveway. The police arrested defendant.

The house had been ransacked. The officers searched defendant and the pillowcase. Defendant was carrying a chisel, a pocketknife, and a flashlight. The pillowcase contained several items, including a wallet, jewelry, coins, and a money box. Guerra later identified these items as belonging to himself or to his family.

At trial, an officer testified that, "[j]ust prior to our transport and while the defendant was in the rear of our radio car he started going into some type of convulsions" and had difficulty breathing.

The officers contacted first aid and an ambulance took defendant to a hospital. While at the hospital, defendant gave his name as "Joseph Califano" and stated he lived in Brooklyn.

The next day, police officers found a car parked near the Guerras' home. The car was registered to defendant's wife. Inside the car, police found a police scanner, chisels, two pry bars, and a wallet with a driver's license giving the name of Joseph Delibero with an Elizabeth address.

A grand jury charged defendant with first-degree robbery, second-degree burglary, criminal mischief, and possession of burglar's tools. Defendant entered a plea of not guilty.

The case was tried before a jury. At trial, defendant introduced evidence of diminished capacity and insanity. He testified that on the night of the break-in he was having dinner with his wife at their home in Elizabeth when he experienced a blackout, after consuming a large amount of food. He recalled seeing "lights exploding" as he left the house. He later felt as if he were watching "from above" as a man struggled with him.

Defendant recalled seeing the police, but said that his head was still "exploding" while everything around him became bright. He woke up in the ambulance, but lost consciousness again and later awoke in the hospital. He had experienced a similar incident years earlier. Defendant recounted a history of abuse while a child and of being moved through several foster homes.

To support his defense, defendant called several witnesses. Dr. Stephen Teich, a forensic psychiatrist who had been appointed by a New York court in relation to an earlier proceeding in New York in which defendant had been found insane, testified. Teich examined defendant concerning the night of the break-in, reviewed defendant's medical records, and interviewed members of defendant's family. Teich testified that "[defendant's] mental illness was very active at the time [the break-in] was going on and that as a result of his mental illness he lacked a substantial capacity to be able ... to know directly what he was doing [or] to have any

awareness of issues of right or wrong." Teich stated that at the time of the break-in, defendant was suffering from a "major [affective] disorder" and "disassociative episodes" that impaired his mental state. Teich concluded that defendant's condition prevented him from forming a purposeful or knowing state of mind with regard to his actions in the Guerra home.

Defendant also called Dr. Benjamin Chu, a psychiatrist. Dr. Chu examined defendant shortly after the break-in. Chu diagnosed defendant as having a "bipolar disorder/mixed," or manic depressive illness. Chu recommended a course of drug treatments and psychiatric therapy for what Chu called defendant's pervasive mood disorder. On cross-examination, Chu admitted that he did not know the legal definition of insanity and could not render an opinion on the effect of defendant's mental state upon a particular action.

Defendant's daughter also testified. She stated that defendant had seemed "unusual" around the time of the break-in, being withdrawn from life and rarely speaking to anyone.

The State offered two witnesses in rebuttal. Dr. Richard Kull, a forensic psychiatrist, concluded from his review of the record that "defendant did have the capacity to form the intent of purposeful or knowing behavior." Dr. Jean Keltz, a psychologist, had interviewed defendant in November 1992, while defendant was being held in pretrial custody at the Trenton Psychiatric Hospital. Keltz testified that defendant had exaggerated his symptoms and was "malingering" in an attempt to remain at the hospital.

The jury convicted defendant of second-degree burglary, criminal mischief, possession of burglar's tools, and second-degree robbery, a lesser-included offense of first-degree robbery. The State moved for an extended term of imprisonment. The trial court granted the motion, and sentenced defendant to two concurrent sixteen-year terms for the burglary and robbery convictions. The trial court merged the criminal mischief conviction with the robbery conviction, and sentenced defendant to six months on the

possession charge, to be served concurrently with the sixteen-year terms.

On appeal, defendant challenged for the first time the instructions to the jury on diminished capacity and insanity. He argued that by requiring him to prove that he labored under "a defect of reason from a disease of the mind so as not to know the nature and quality" of his acts, the instructions placed upon him the burden of disproving the intent element of the offenses charged. Defendant did not challenge that portion of the charge instructing the jury that the insanity defense would prevail if defendant did know the nature and quality of his acts, but did not know the acts were wrong.

The Appellate Division, in an unreported opinion, reversed defendant's conviction because it found that the trial court's jury instructions had impermissibly shifted the burden of proof to defendant to establish innocence.

## II

The trial court first charged the jury on diminished capacity. After summarizing the testimony of Dr. Teich and Dr. Kull, the trial court charged:

Now, we're going to go into the issues of mental disease and defect now, which have taken a lot of time in this case, which much of the case is about.

You heard the concept, I think referred to by both attorneys, mental defect or diminished capacity. I'm going to talk about it now.

\* \* \* \* \* \* \* \*

Evidence as to the defendant's mental state may be considered by you in determining whether or not the State has proven beyond a reasonable doubt that the defendant acted purposely, knowingly or recklessly on June 30, 1991.

If you find the State has failed to prove beyond a reasonable doubt that the defendant had the requisite mental states required for this crime, you must find him not guilty. If you find the State has proven beyond a reasonable doubt all of the elements of the crime inclusive of the mental states required, then you should find him guilty. If you find the State has not proven any of the elements or any part thereof of these crimes, you must, of course, find him not guilty.

Immediately after this instruction, the trial court, generally tracking the model jury charge, instructed the jury on the issue of insanity.

> The second mental state or issue we're talking about is that of insanity. And this is somewhat different from the diminished capacity.
>
> The defendant maintains that he is not guilty of the crimes charged by reason of insanity. If you find that the State has failed to prove beyond a reasonable doubt any essential element of the offense or the defendant's participation in the events, you must find him not guilty and of course you need not consider the evidence as to his insanity or lack of same.
>
> If you find the State has proven beyond a reasonable doubt each essential element of the offense and his participation in the crime, then you must consider the evidence as to his sanity.
>
> \*       \*       \*       \*       \*       \*       \*       \*
>
> ... Insanity is an affirmative defense and the burden of proving it by a preponderance of the evidence is on the defendant who asserts that particular defense. If there is no preponderance of the evidence of insanity, the insanity defense fails and the defendant stands in the position of a sane person responsible for all criminal acts.
>
> ... If at the time of committing the act the defendant was laboring under a defect of reason from a disease of the mind, so as not to know the nature and quality of the act he was doing, or if the defendant did know it, that he did not know what he was doing was wrong, the defendant then was legally insane and therefore, not criminally responsible for his acts. That's the standard you must apply in this case.
>
> \*       \*       \*       \*       \*       \*       \*       \*
>
> Keep in mind, however, that although the burden rests upon the defendant to establish the defense of insanity by a preponderance of the credible evidence, the burden of proving the defendant guilty of the offense charged here beyond a reasonable doubt is on the State, and that burden never shifts.
>
> \*       \*       \*       \*       \*       \*       \*       \*
>
> If you find the State has proven all the elements of the crime and the defendant has established his defense of insanity by a preponderance of the credible evidence, your verdict should be "not guilty by reason of insanity" and you shall so report when a verdict is asked of you.

The Appellate Division found that the trial court correctly instructed the jury on diminished capacity, but found that the charge on insanity was inadequate. The court acknowledged that placing a statutory burden upon a defendant to prove insanity was not unconstitutional. However, the Appellate Division found that

the instruction on insanity prevented the jury from considering evidence that may have been relevant to whether defendant had the requisite mental state to commit the crimes charged.

Relying on federal precedent, the court stated that "[i]t was essential that the jury consider how evidence of defendant's insanity bears on the issue of whether the State has met its burden of proof of defendant's intent." The Appellate Division found that the trial court had failed to clarify for the jury that evidence of insanity was relevant to the State's burden of proving defendant's mental state. The instruction therefore unconstitutionally shifted the burden of proof to defendant on an essential element of the offense.

We granted the Union County Prosecutor's petition for certification. 146 *N.J.* 497, 683 *A.*2d 200 (1996). We also granted permission to the Attorney General to appear and submit a brief as *amicus curiae.*

### III

■ On prior occasions, we have reviewed the difference between the concepts of diminished capacity and insanity. *See State v. Galloway,* 133 *N.J.* 631, 628 *A.*2d 735 (1993); *State v. Zola,* 112 *N.J.* 384, 548 *A.*2d 1022 (1988), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989); *State v. Breakiron,* 108 *N.J.* 591, 532 *A.*2d 199 (1987). These terms are complex and their application has long troubled the law. *See generally* Daniel N. Robinson, *A History of the Insanity Defense from Antiquity to the Present* (1996). It is sufficient to observe that diminished capacity refers to evidence that can negate the presence of an essential mental element of the crime (as when, for example, a learning-disabled person strikes another but is unable to know that the blow could kill). *Breakiron, supra,* 108 *N.J.* at 600–01, 532 *A.*2d 199. A jury considers evidence of diminished capacity in relation to the State's burden to prove the essential elements of the crime. *State v. Harris,* 141 *N.J.* 525, 555, 662 *A.*2d 333 (1995).

■ Insanity, by contrast, is an affirmative defense that a defendant must prove by a preponderance of the evidence. *Id.* at 552, 662 *A.*2d 333. *N.J.S.A.* 2C:4–1 defines the defense as when a person was "laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act . . ., or, if [the actor] did know it, that [the actor] did not know what [the actor] was doing was wrong."[1] An insane person, unlike one suffering from diminished capacity, may act in accordance with the elements required to commit an offense, but the insanity absolves that person of criminal responsibility. The familiar example is that of a son who kills his mother because he believes that the voice of God has directed him to act. Generally, the defense of insanity has been raised only for the most serious crimes: "[t]here is not an operating defense of insanity in relation to burglary or theft, or the broad sweep of index crimes generally. . . . Operationally the defense of insanity is a tribute, it seems . . . to our hypocrisy rather than to our morality." Norval Morris, *Madness and the Criminal Law* 63–64 (1984).

The manner in which federal law has treated the effect of mental illness on culpability and the presence of the requisite mental states compounds the difficulty in distinguishing between the concepts. It is no easy task to simplify for a jury the burden-shifting that federal doctrine requires.

### A.

■ The State in a criminal prosecution is bound to prove every element of the offense charged beyond a reasonable doubt. *In re Winship*, 397 *U.S.* 358, 90 *S.Ct.* 1068, 25 *L.Ed.*2d 368 (1970). That burden cannot be shifted to a defendant, even when a defendant is asserting an affirmative defense. *Mullaney v. Wilbur*, 421 *U.S.* 684, 95 *S.Ct.* 1881, 44 *L.Ed.*2d 508 (1975). In *Leland v. Oregon*, however, the United States Supreme Court held that it

---

[1] The statute codifies the standard announced in *M'Naughten's Case,* 8 *Eng. Rep.* 718 (1843).

would be permissible to impose on a defendant the burden of proving an exculpatory insanity defense, 343 *U.S.* 790, 799, 72 *S.Ct.* 1002, 1007–08, 96 *L.Ed.* 1302, 1308–09 (1952), so long as the State remained constitutionally responsible to prove every element of the offense beyond a reasonable doubt. *Id.* at 799–800, 72 *S.Ct.* at 1008, 96 *L.Ed.* at 1309. The principle announced in *Leland* was affirmed in *Patterson v. New York,* which upheld a burden on defendants to prove extreme emotional distress as a defense to murder because such a defense did not require negation of any facts that the State was required to prove. 432 *U.S.* 197, 97 *S.Ct.* 2319, 53 *L.Ed.*2d 281 (1977).

Ten years after *Patterson,* the Court decided *Martin v. Ohio,* 480 *U.S.* 228, 107 *S.Ct.* 1098, 94 *L.Ed.*2d 267 (1987), which concerned the imposition of a duty upon a defendant, charged with aggravated murder, to prove self-defense by a preponderance of the evidence. The Court held that Ohio's requirement did not violate the Due Process clause because it did not "shift to the defendant the burden of disproving any element of the State's case." *Martin, supra,* 480 *U.S.* at 234, 107 *S.Ct.* at 1102, 94 *L.Ed.*2d at 274. The *Martin* court said that its decision might have been different if "the jury had been instructed that self-defense evidence could not be considered in determining whether there was a reasonable doubt about the State's case, i.e., that self-defense evidence must be put aside for all purposes unless it satisfied the preponderance standard. Such an instruction would ... plainly run afoul of [*Winship* ]." *Martin, supra,* 480 *U.S.* at 233–34, 107 *S.Ct.* at 1102, 94 *L.Ed.*2d at 274. *But see Montana v. Egelhoff,* —— *U.S.* ——, 116 *S.Ct.* 2013, 135 *L.Ed.*2d 361 (1996) (limiting foregoing language in *Martin* in context of admissibility of intoxication evidence, and stating that right to present such evidence was not fundamental).

The reasoning of *Leland, Patterson,* and *Martin* does not extend to the burden of proving the existence of diminished capacity. In *Breakiron,* we upheld the then-current version of the diminished capacity statute, which imposed a burden upon a

defendant of proving diminished capacity by a preponderance of the evidence. We found that the statute required only that the defendant show the existence of a mental disease or defect relevant to an element of the offense. *Breakiron, supra,* 108 *N.J.* at 611, 532 *A.*2d 199. The burden remained on the State to prove *mens rea* (the culpable mental state of the actor). *Id.* at 613, 532 *A.*2d 199. *See also Zola, supra,* 112 *N.J.* at 399, 548 *A.*2d 1022 (affirming *Breakiron* ).

In *Humanik v. Beyer,* 871 *F.*2d 432 (3d Cir.), *cert. denied,* 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1989), however, the Third Circuit ruled that imposing such a burden on a defendant violated federal due-process requirements. Such a burden impermissibly imposed a "filter" that relieved the burden of the State to prove every element of the crime. *Id.* at 443.

■ *Humanik* and *Breakiron* concerned an earlier version of New Jersey's diminished capacity statute. The Legislature subsequently amended the statute. *L.* 1990, *c.* 63, § 1. The current statute does not impose a burden of proof; evidence of diminished capacity is admissible "whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense." *N.J.S.A.* 2C:4–2. Our courts no longer instruct the jury that a defendant asserts an affirmative defense when presenting evidence of diminished capacity. *Harris, supra,* 141 *N.J.* at 551, 662 *A.*2d 333.

### B.

■ Often, however, evidence of the two concepts may overlap; facts adduced in support of one claim may be relevant to the other. *State v. Moore,* 113 *N.J.* 239, 287–88, 550 *A.*2d 117 (1988). When evidence relating to an affirmative defense also bears on the elements of an offense, the jury must be allowed to consider the evidence for that purpose as well. *State v. Sette,* 259 *N.J.Super.* 156, 183, 611 *A.*2d 1129 (App.Div.), *certif. denied,* 130 *N.J.* 597, 617 *A.*2d 1219 (1992).

In *Harris*, the defendant presented evidence that supported claims of both insanity and diminished capacity. 141 *N.J.* at 552, 662 *A*.2d 333. The defendant objected to the jury instructions concerning these claims. He alleged that the instructions stratified the jurors' deliberations and prevented them from considering the evidence in reaching a proper verdict. *Id.* at 553, 662 *A*.2d 333.

We disagreed, and found the instructions proper. We noted that the trial court had gone to great lengths to fashion a fair and correct charge in accordance with the burden-shifting required by constitutional principles. *Ibid.* The trial court had instructed the jury to consider the insanity defense only after it had found that the State had proven all elements of the crimes charged. The court then instructed that the jury consider the evidence on diminished capacity "in the event that you find that the defendant has not carried [the] burden as to the defense of insanity." *Id.* at 554, 662 *A*.2d 333. Seen as a whole, the jury instructions conveyed to the jury that it had to consider evidence of diminished capacity in relation to the State's burden. It was told to ignore evidence of diminished capacity only if it found the defendant not guilty by reason of insanity. *Id.* at 555–57, 662 *A*.2d 333.

The instructions given in *Harris* are the reverse image of those here. In *Harris*, the court instructed the jury to consider insanity first and then diminished capacity. In Delibero's case, the court instructed the jury to consider diminished capacity first and then insanity. Specifically, the jury was instructed that it must consider evidence as to defendant's mental capacity in "determining whether or not the State has proven beyond a reasonable doubt that the defendant acted purposely, knowingly or recklessly." This instruction correctly explained that the jury could consider evidence as to a defendant's mental state in relation to the elements of the crime, regardless of whether the jury believes that the defendant has proven diminished capacity by a preponderance of the evidence, and the instruction did not contravene *Humanik, supra,* 871 *F*.2d at 440.

The Appellate Division reasoned, however, that the insanity instruction

> served to set up a model of procedure for the jury: consider all but the evidence concerning insanity to determine whether the State met its burden of proof. The thought continued in the next sentence when the judge told the jury to consider the "evidence as to [defendant's] sanity" only if it found the State had "proven beyond a reasonable doubt each essential element of the offense and his participation in the crime."

The Appellate Division determined that the instruction prevented the jury from finding that the evidence of defendant's insanity could have raised a reasonable doubt as to defendant's intent.

There is an abstract logic to this reasoning, but there is no concrete basis to infer harm in this case. By definition, any evidence of insanity that would tend to negate *mens rea* would have already been considered by the jury under the diminished capacity charge. Obviously, the overlapping evidence from Doctor Teich that "as a result of his mental illness, [defendant] lacked a substantial capacity to be able to know directly what he was doing," was considered by the jury. The expert witnesses did not compartmentalize their testimony. Only if the jury found beyond a reasonable doubt that the State had proven every element of the offense would it then consider the statutory defense of insanity.

In a real sense, then, all that was left for the jury to consider in this case was the second prong of the *M'Naughten* test relating to whether defendant, despite knowing the nature and quality of his acts, did not think that they were wrong. The trial court gave a thumbnail description of insanity by stating that "[i]t is society's moral judgment, recognized by our law, that a forbidden act should not be punished unless it's done with a knowledge that in fact it's wrong."

Although the precedent does not always distinguish between the two *M'Naughten* prongs, we agree that in some cases evidence bearing on the first prong (nature and quality of the act) may also bear on the culpable mental states charged. We considered at oral argument the examples of one who stabbed another thinking that the victim would rise from the dead, and of one who stabbed

another while thinking the victim was a pumpkin being carved. In the former example, the actor has the knowledge and purpose to kill, but does not know the nature and quality of the act. In the latter example the actor lacks any intent to kill. The evidence in this case was not so finely spun. It is difficult to accept that one who suffered a "blackout" after "gorging" at dinner would have by happenstance brought along a police scanner and pry bars.

The complexity of drawing the distinctions between the concepts of diminished capacity and insanity may call for a fuller instruction, but this was not an incorrect instruction.

> Admittedly, the circumstances which give rise to a defense of insanity sometimes also warrant the conclusion that the defendant did not commit the acts with the requisite mental state. However, this overlap does not obliterate the differences between the two types of verdicts, nor between the legal consequences of a mental disease that prevents the formation of mens rea and the legal consequences of a mental disease that allows the formation of mens rea but nonetheless excuses the crime.
>
> [Amy Baker Benjamin, *The Jurisdictional Implications of a Mens Rea Approach to Insanity: Plugging the "Detainment Gap" After* Foucha v. Louisiana, 19 *U. Dayton L.Rev.* 41, 45 n. 20 (1993).]

In imposing any burden on defendant, the trial court was simply attempting to convey to the jury the differences between the "legal consequences of a mental disease that prevents the formation of mens rea and the legal consequences of a mental disease that allows the formation of mens rea but nonetheless excuses the crime." [2] *Ibid.* The consequences of a verdict of

---

[2] "You can be insane yet still be capable of entertaining the subjective desire to kill a human being. But you cannot be convicted of murder if you are so crazy that you kill without knowing what you are doing. Thus, if [an accused] was under the delusion that he was shooting two gerbils rather than two human beings, he could not be guilty of murder, but if [the] delusion took the form of thinking that he had a sacred duty to reduce the human population by two, he could be guilty of murder, at least guilty prima facie, though he might have a defense of insanity. Because a state of mind requirement is part of the prima facie case of murder, even if the defense of insanity were abolished ... some insane killers would still escape conviction for murder, because their insanity had prevented them from forming the intent required of a murderer." *Greider v. Duckworth*, 701 *F.*2d 1228, 1236–37 (7th Cir.1983) (Posner, J., concurring) (internal quotations and citations omitted).

insanity differ from one of diminished capacity. A judgment of not guilty by reason of insanity does not result in a defendant being set free; rather, the defendant is subject to further commitment proceedings. A judgment of not guilty because of the defendant's diminished capacity does result in a defendant being set free. *State v. Humanik*, 199 *N.J.Super.* 283, 299 n. 6, 489 *A.*2d 691 (App.Div.), *certif. denied*, 101 *N.J.* 266, 501 *A.*2d 934 (1985), *rev'd o.g. sub nom. Humanik v. Beyer, supra*, 871 *F.*2d 432.

The trial court made it clear to the jury that although insanity is an affirmative defense, "the burden of proving the defendant guilty of the offense charged here beyond a reasonable doubt is on the State, and that burden never shifts." The trial court did not tell the jury it should ignore the evidence that bore on diminished capacity and insanity in determining whether the State had met its burden.

Instead, the court stated that any "evidence as to the defendant's mental state may be considered . . . in determining whether or not the State has proven beyond a reasonable doubt that the defendant acted purposely, knowingly or recklessly." We do not have here a "backward charge" [3] that would create the possibility that the jury understood the instructions in an unconstitutional manner. *Harris, supra*, 141 *N.J.* at 556, 662 *A.*2d 333 (citing *Francis v. Franklin*, 471 *U.S.* 307, 322 n. 8, 105 *S.Ct.* 1965, 1975 n. 8, 85 *L.Ed.*2d 344, 359 n. 8 (1985)). Logically, the jury first had to consider whether defendant was guilty before considering whether he would be exculpated. Finally, the trial court did not build a firewall between the overlapping evidence of diminished capacity and insanity; the trial court was simply providing a coherent framework within which to assess the different burdens of proof

---

[3] In *State v. Erazo*, 126 *N.J.* 112, 125–26, 594 *A.*2d 232 (1991), we found that an instruction that the jury could find passion/provocation manslaughter only if it first acquitted the defendant of knowing or purposeful murder was "backwards" because only a homicide that would otherwise be knowing or purposeful could be reduced to manslaughter by the presence of passion/provocation.

and a proper sequence of deliberations in relation to the common body of evidence.

In the future, to remove any ambiguity, trial courts should explicitly instruct juries that in considering the prosecution's burden to prove every element of an offense charged beyond a reasonable doubt, the jury must consider all evidence of a defendant's mental state, including that offered as evidence of diminished capacity or of insanity. The instructions given by the trial court in *Leland* provide a guide. The court there instructed the jury that the "evidence adduced during this trial to prove defendant's insanity shall be considered and weighed by [the jury], with all other evidence, whether or not you find defendant insane, in regard to the ability of the defendant to [form the requisite mental state]." *Leland, supra,* 343 *U.S.* at 794–95, 72 *S.Ct.* at 1005, 96 *L.Ed.* at 1307.

## IV

To sum up, we agree with the Appellate Division that incorrect instructions of law are poor candidates for rehabilitation under the harmless error doctrine. *State v. Weeks,* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987). But these instructions were not so much incorrect as they were capable of being improved. If counsel had pointed out to the trial court all the concerns raised in this appeal, the court could have fashioned a better charge that would have specifically instructed the jury to consider the evidence bearing on insanity in assessing whether the State had met its burden of proving beyond a reasonable doubt every element of the offenses charged.

The objection to the charge given arises as one of plain error and the question is whether the absence of the specific instruction was such that it was clearly capable of producing an unjust result. *R.* 2:10–2. A jury charge must be examined in its entirety. *State v. Ramseur,* 106 *N.J.* 123, 280, 524 *A.*2d 188 (1987). "[P]ortions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a

whole to determine its overall effect." *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973). A consideration of the instruction as a whole leads to the conclusion that its entirety overcame any omission specifically to have better instructed the jury. Taken as a whole, the instruction could not be understood to have foreclosed the jury's full and appropriate consideration of the evidence of insanity in weighing whether the State had met its burden of proof.

The Appellate Division having found no other grounds to reverse the conviction, the judgment of the Appellate Division is reversed and defendant's conviction is reinstated. The matter is remanded to the Law Division for resentencing in accordance with the opinion of the Appellate Division.

*For reversal and reinstatement*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.