**Gary Lee ROCK, Appellant,**

v.

**Leroy S. ZIMMERMAN; John F. Nelson, District Attorney of Franklin County.**

No. 90–5120.

United States Court of Appeals, Third Circuit.

Argued April 2, 1991.

Reargued Nov. 13, 1991.

Decided March 24, 1992.

David Rudovsky (argued), Kairys & Rudovsky, Philadelphia, Pa., for appellant.

John F. Nelson (argued), Office of the Dist. Atty., Chambersburg, Pa., for appellees.

Argued before: MANSMANN and ALITO, Circuit Judges, and O'NEILL, District Judge.*

Reargued before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO and ROTH, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

In this appeal from the district court's denial of relief in a habeas corpus proceeding, 729 F.Supp. 398, Gary Lee Rock asks us to set aside his 1985 Pennsylvania state

* Honorable Thomas N. O'Neill, Jr., United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

court convictions on two counts of first-degree murder, four counts of attempted murder, and two counts of aggravated assault.

The judge at Rock's trial attempted to explain to the jury, first, that they should determine whether petitioner had a specific intent to kill by examining all of the circumstances surrounding the death of his victims and, second, that they should infer that he did have such an intent only if those circumstances left no reasonable doubt in their minds on the point. Unfortunately, the judge did not confine himself to saying just that; rather, he chose to speak in terms of a "presumption." As the Supreme Court has noted both before and after petitioner's trial, the use of the word "presumption" in a charge to a jury in a criminal case is fraught with constitutional difficulty and should be avoided. The post-trial proceedings in this case demonstrate the wisdom of that proposition. We are persuaded beyond a reasonable doubt, however, that the result would have been no different if the trial judge had followed the distinctly preferable course of speaking solely in terms of the drawing of *inferences* from the available evidence.

Rock's petition for *habeas corpus* relief also complains of the trial court's failure to grant a change of venue and of the imposition of graver sentences after his initial sentence was vacated and he was retried. Since we conclude that the sentences Rock is now serving are not constitutionally infirm for any of these reasons, we will affirm the order of the district court.

## I.

On July 27, 1977, after setting fire to his cabin and shed, Gary Lee Rock shot and killed Wilbur Brookens and James Cutchall when they came to his aid. He also shot at but failed to kill six members of the Fayetteville volunteer fire department. Although there was conflicting evidence at trial concerning Rock's mental condition on the day of the shootings, there was virtually no dispute about the events of that day and the background of those events.

Rock grew up in Franklin County, Pennsylvania. After a period of service in the Marine Corps, he returned home and, at the time here relevant, lived in a cabin which he had completely renovated in a rural, wooded area. Rock testified that in the months preceding the shootings, he suffered bouts of depression and anger. On at least one occasion, he considered taking his own life. Rock experienced dissatisfaction with his job, which he referred to as "women's work," and frustration over his inability to secure a promotion. He also was despondent over his failure to develop a lasting relationship with a woman.

On the night before the killings, Rock attended a friend's party where he saw a woman whom he had previously dated. Upset over the fact that she was with another man, Rock left the party, sat in his truck, and cried. He eventually drove home and fell asleep on his couch.

Upon awakening, Rock drove to town and purchased forty rounds of .300 calibre rifle ammunition and two boxes of 12–gauge shotgun shells, purportedly for the purpose of groundhog hunting. Rock was an avid hunter and, as a result of his military training, a certified expert marksman.[1] When he returned home, Rock dressed himself in combat boots and fatigues and fired several practice rounds from his scope-equipped, .300 Savage rifle at a paper target affixed to a tree stump behind his house. The target was later found to have had one bullet hole in the upper left-hand corner and four bullet holes within one inch of each other in the target's center. After sighting his rifle, Rock poured gasoline in various rooms of his cabin and shed and set the structures on fire.

Seeing the smoke from the ensuing blaze, Rock's neighbor, Wilbur Brookens, approached the burning home in an apparent attempt to help put out the fire. He

---

1. Rock testified at trial that the Marine Corps assigned three grades to its marksmanship trainees: expert, sharpshooter, and marksman. Rock stated that his "expert" rating "would be the top" proficiency ranking.

died when Rock fired a single bullet from the .300 Savage into his heart. Shortly thereafter, Fayetteville Fire Chief James Cutchall approached the blaze. Rock killed Cutchall with a bullet to the head. A fire truck arrived next on the scene and Rock fired several shots through its windshield, wounding two fire fighters and narrowly missing four others.

Armed with his rifle, shotgun, and ammunition for both weapons, and carrying two canteens, Rock fled into the wooded mountains behind his cabin. When the police apprehended him several hours later, he inquired, "How many did I kill?" At trial, Rock disputed the testimony of one officer that Rock also stated at the scene of his capture, "I saw two fall." (Rock testified that he believed that he was shooting at moving objects rather than people.)

These events led to Rock's conviction in 1978 on two counts of first-degree murder and six counts of attempted murder. Judge Eppinger, who presided over the trial, sentenced Rock to life imprisonment terms for each of the murder convictions. He further imposed on Rock a three-to-eight year sentence for one of the attempted murder counts and five suspended sentences for the remaining convictions. The judge directed that the life sentences run concurrently with each other and consecutively with the attempted murder sentence. The Supreme Court of Pennsylvania affirmed the convictions on a per curiam opinion. *Commonwealth v. Rock*, 430 A.2d 1150, 430 A.2d 1150 (1981).

Rock subsequently succeeded in obtaining federal habeas corpus relief based on a finding that he had received ineffective assistance of counsel during this trial. *Rock v. Zimmerman*, 586 F.Supp. 1076 (M.D.Pa. 1984). At his retrial, Rock conceded that he had fired the shots that killed Brookens and Cutchall and injured the other victims. Thus the critical issue before the jury was whether Rock had the requisite state of mind. Rock's defense was twofold. He asked the jury to find him either (1) not guilty by reason of insanity or (2) incapable by reason of diminished capacity of forming a specific intent to kill and thus guilty

only of third-degree murder. The Commonwealth, conversely, argued that Rock's actions—purchasing the ammunition, sighting and scoping his rifle, dressing in combat boots and fatigues, setting fire to his house, waiting for the predictable responses of the victims, and asking how many people he had killed—though irrational, evinced deliberate preparation and thus warranted guilty verdicts of first-degree and attempted murder.

Dr. Tanay, the forensic psychiatrist for the defense, testified that at the time Rock fired his rifle he suffered from a "psychotic episode" or "reactive psychosis." Dr. Tanay opined that because of this mental disease, Rock neither understood "the nature and quality of his acts when he was firing" nor knew that he was doing wrong. Tr. 499–500. After explaining the reasons for these opinions at some length, Dr. Tanay's direct examination concluded with the following question and answer:

Q. Now, Doctor, I ask you if you have an opinion based on a reasonable degree of medical certainty as to whether the cause of the mental disease and defect you have testified to, if Gary Rock had the capacity to form an intent to kill at the time he was firing his rifle?

A. In my opinion, he did not have the capacity to form the intent because of the mental impairment, the mental illness, from which he suffered at the time. The disruption of his mental apparatus precludes the ability to form intent, as I understand that particular legal concept.

Tr. 511–12. At no point in his testimony did Dr. Tanay articulate an opinion or an analysis that would support a conclusion that even if found to be legally sane, Rock might nevertheless have lacked the capacity to form an intent to kill.

Dr. Hume, the prosecution's forensic psychiatrist, agreed with Dr. Tanay that Rock suffered from a mental disease or defect at the time he fired his rifle. Dr. Hume insisted, however, that Rock understood the consequences that would flow from pulling the trigger, that he knew pulling the trigger was wrong, and that he had the mental capacity to form an intent to kill.

In closing argument, defense counsel initially identified two reasons why the defendant should not be convicted of first-degree murder: the failure of the state to prove sanity and the failure of the state to disprove "diminished capacity." Tr. 640. The entire argument which followed, however, was addressed to the state's alleged failure to prove sanity. In the Commonwealth's closing, the prosecutor tacitly acknowledged the existence of a mental disease or defect, but insisted that Rock's ability to appreciate the consequences of his actions and to distinguish right from wrong had been established beyond a reasonable doubt.

After eight hours of deliberation, the jury asked the trial judge to explain "the difference between murder of the first degree and murder of the third degree with diminished capacity[,] ... review [the elements] of voluntary manslaughter[,] ... [and] [e]xplain intent in regards to the hitting of a vital organ." App. 20.

In response, the court gave a supplemental charge which read in relevant part:

Now, you remember that that is the main difference between murder in the first degree and murder in the third degree. In murder in the first degree there has to be intentional killing; and that is defined, we told you, as lying in wait or willful and premeditated killing. So if there is diminished capacity, and you so find, then that reduces the crime to murder in the third degree, if all the other elements of murder are present.

Here the defendant asserts that as a result of an abnormal mental condition, he was, at the time of the killing, incapable of fully forming the intent to kill. Obviously, you cannot find him guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant's claim is wrong and that he was capable of the specific intent to kill.

As we have said frequently, the Commonwealth must prove all of the elements of the crime charged. Therefore, if the Commonwealth has not proven beyond a reasonable doubt that the defendant does not suffer from an abnormal condition which made him incapable of forming a specific intent to kill, and if the Commonwealth proved beyond a reasonable doubt all of the other elements of murder in the first degree, then he is entitled to have your verdict reduced to guilty of murder in the third degree.

\* \* \* \* \* \*

Now, I don't know whether this will be of any help to you; but our courts have also told us what diminished capacity is not. I will read that to you. It is not an excuse for anti-social behavior. It is not something that excuses someone who loses their control or judgment under stress or somebody who reacts to stress by violence. I hope that will help you with that particular problem.

Then you inquired as to the intent in regard to the hitting of a vital organ; and if you will recall, I told you in the charge on first-degree murder that the intentional, unlawful, and fatal use of a deadly weapon against a vital part of the body gives rise to the presumption of fact that an intent to kill existed. This is a presumption of fact based on common knowledge that such use is almost certain to be fatal.

Every person is presumed to intend the natural and probabl[e] consequences of his act; but being a presumption of fact, it may be rebutted by other circumstances in the case, and whether it is so rebutted is a question for you to decide.

So what the law is on the subject is that if Mr. Rock intentionally, without justification, that means lawfully, did use a deadly weapon against a vital part of the body of the victim or victims, then that gives rise for you to consider that there is a presumption of fact that an intent to kill existed. Because we all know that such use is almost certain to be fatal.

However, let me also remind you in your deliberations that I used the word intentional use of a deadly weapon against a vital part of the body. Here you have to incorporate in your considerations and in your deliberations this insanity, this legal insanity defense.

Because if Mr. Rock suffered from a mental disease and if he did not know the nature and quality of the act he performed that he did, namely the use of the rifle and the aiming at a vital part of the body, or if he knew what he was doing but didn't know it was wrong, then it could not be intentional. So we go in a circle, and you have to address your thoughts to the insanity defense.

Did the Commonwealth prove beyond a reasonable doubt that Mr. Rock was legally sane? If you find he was legally sane, then it is proper for you to apply this presumption if you see fit and if it is not rebutted in any other way.

App. 29–32. Immediately following this supplemental charge, Rock's counsel objected to the instruction concerning the "items which [the court] said would not constitute diminished capacity." App. 34. He further objected to "the instruction with respect to the intentional use of a deadly weapon on a vital part of the body ... because it shifts the burden of proof from the prosecution to the defense."[2] *Id.* Less than ninety minutes later, the jury returned guilty verdicts for two counts of first degree murder, four counts of attempted murder, and two counts of aggra-

vated assault. Judge Keller, who presided over the trial, imposed on Rock two consecutive life sentences and directed that they run concurrently with a prison term of 26 to 60 years for the four attempted murder and two aggravated assault convictions.

After exhausting all state court remedies, Rock filed a federal habeas corpus proceeding in which the district court denied relief. A panel of this court issued a judgment reversing the district court. We granted the Commonwealth's subsequent petition for rehearing and vacated the panel's opinion.

■ We have jurisdiction over this appeal pursuant to 28 U.S.C. § 2253. We exercise plenary review over the district court's conclusions of law in this habeas proceeding. *Humanik v. Beyer,* 871 F.2d 432, 435 (3d Cir.), *cert. denied,* 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

## II.

■ Before turning to our assigned task of resolving the federal constitutional issues presented by the foregoing events, it is helpful to understand three concepts of Pennsylvania homicide law. First, an essential element of first-degree homicide in

---

**2.** Defense counsel had also objected to the trial judge's initial instructions on specific intent. These instructions read in relevant part:

If a person intends to kill, the intention is to be gathered from all of the circumstances surrounding the act....
That is, every inference should be considered by you; and if a person intended to kill, then the presence of that intention shows that the act was willful.

\* \* \* \* \* \*

We should at this point also tell you the intentional, unlawful, and fatal use of a deadly weapon against a vital part of the body gives rise to the presumption of fact that an intent to kill existed.
This is a presumption of fact based on common knowledge that such use is almost certain to be fatal. Every person is presumed to intend the natural and probable consequences of his act, but being a presumption of fact it may be rebutted by other circumstances in the case; and whether it is so rebutted is a question for you to decide.
In other words, members of the jury, you may, if you see fit, find an intent to kill existing from the fact that the defendant did use the 300 Savage rifle; that he did fire it;

that he did strike Mr. Brookens in the chest and blow out his heart; and did fire it again and struck Chief Cutchall in the skull and damaged his brain causing death in each case. These things you may, if you see fit, consider in determining whether or not there is an intent to kill.
If you find the existence of an intent to kill, then you must also determine the presumptions of fact that I have just referred to have been rebutted by other circumstances in the case and whether they have been so rebutted is entirely a question for you to decide as the triers of fact.
Now, recall please that in murder of the first degree there must appear from all of the evidence in the case the existence of a fully formed conscious intention to kill, in other words, a specific intent to take life, either from the facts or to be inferred from the facts, or rising out of presumptions as we explained them to you.

App. 7–10. In our view, these instructions do not differ in any material respect from the supplemental instructions. For that reason and because Rock asks us to focus on what the jury last heard, our analysis will focus primarily on the supplemental instructions.

Pennsylvania is that the killing be "intentional." 18 Pa. Const. Stat.Ann. § 2502(a) (1983). "Intentional killing" in this context means "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing." 18 Pa. Const. Stat.Ann. § 2502(d) (1983). Rock's trial judge defined "willful, deliberate, and premeditated" as follows:

A killing is said to be willful when it is intentional.... When the mind has formed a full conscious purpose to kill, it is premeditated. When there is time to form the conscious purpose to kill and to select a weapon with which to kill or adopt a plan with which to carry this design into execution, it is premeditated.

\* \* \* \* \* \*

If the circumstances are such to show the intention to kill, that the person considered whether he would take the life of another or not, considered it, reached a conclusion that he would kill, then it is deliberate within the meaning of the phrase to which we have [al]luded.

Tr. 720–21. Since this segment of the judge's charge is unchallenged, we accept this as an accurate statement of the *mens rea* required by Pennsylvania's first-degree homicide statute.

■ Second, Pennsylvania subscribes to the classic *M'Naghten* test of insanity. *See* 18 Pa. Const. Stat.Ann. § 314 (1983). Rock's trial judge thus gave the jury the following definition of insanity:

The test or definition of legal insanity is this: A person is legally insane if at the time of committing an alleged crime he is laboring under a defective reason from the disease of the mind as not to know the nature and quality of the act he is doing; or if he does know the nature and quality of the act, he does not know that what he is doing is wrong.

App. 15.

■ Third, Pennsylvania has recognized the so-called "diminished capacity defense" since the state's Supreme Court decision in *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976). Subsequent case law, however, makes it clear that "diminished capacity" is not technically a "defense,"

but rather a contention that the state is unable to prove one of the essential elements of first-degree murder—deliberation and premeditation—because the defendant is without the mental capacity to carry out a plan or design. As the Supreme Court of Pennsylvania has explained:

[D]iminished capacity is an extremely limited defense.... *Walzack* stands only for the proposition that "psychiatric testimony which speaks to the legislatively defined state of mind encompassing a specific intent to kill is admissible." Thus, psychiatric testimony is irrelevant, under *Walzack*, unless "it speaks to mental disorders affecting the cognitive functions [of deliberation and premeditation] necessary to formulate a specific intent." [P]sychiatric testimony ... [that is] no more (nor less) than testimony as to [a defendant's] irresistible impulses or inability to control himself, and not to his ability to formulate and carry out a plan or design, [is] therefore, irrelevant and inadmissible on the issue of [defendant's] specific intent to kill.

*Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 943 (1982) (citations omitted).

### III.

■ The Due Process Clause requires that the State prove each element of the crime charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). Accordingly, a criminal conviction cannot stand unless the jury is instructed that the State must tender evidence which convinces the jury beyond a reasonable doubt of the existence of each element. *Sandstrom v. Montana*, 442 U.S. 510, 520–24, 99 S.Ct. 2450, 2457–59, 61 L.Ed.2d 39 (1979). Jury instructions that explain the inevitable process of drawing reasonable inferences from the record evidence are entirely consistent with this constitutional mandate and, indeed, highly effective tools in equipping the jury for carrying out its assigned responsibilities. *See Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 1892 n. 7, 114 L.Ed.2d 432 (1991) (permissive inference is

constitutional so long as the inference it permits would not be irrational). Jury instructions, however, which tell the jury that if satisfied about the existence of a predicate fact, it may assume an essential element of the crime without being satisfied of the existence of that element beyond a reasonable doubt are another matter entirely. In other words, if a jury is instructed that the State may satisfy its burden by something less than evidence which convinces the jury of each element of the offense beyond a reasonable doubt, the Due Process Clause is violated.

In the context of this case, the most helpful Supreme Court precedent is *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The defendant in *Francis* challenged the following instructions from his homicide trial:

> A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking or intention or criminal negligence. The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted. A person will not be presumed to act with criminal intention but the trier of facts, that is, the Jury may find criminal intention upon a consideration of the words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is prosecuted.

471 U.S. at 311–12, 105 S.Ct. at 1969–70.

The Supreme Court vacated the defendant's conviction, reasoning as follows:

> The portion of the jury charge challenged in this case directs the jury to presume an essential element of the offense—intent to kill—upon proof of other elements of the offense—the act of slaying another. In this way the instructions "undermine the factfinder's responsibility at trial, based on evidence adduced by the State to find the ultimate facts beyond a reasonable doubt." *Ulster County Court v. Allen, supra* [442 U.S. 140], at 156 [99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979)] (emphasis added).

The language challenged here differs from *Sandstrom*, of course, in that the jury in this case was explicitly informed that the presumptions "may be rebutted."

\* \* \* \* \* \*

> An irrebuttable or conclusive presumption relieves the State of its burden of persuasion by removing the presumed element form the case entirely if the State proves the predicate facts. A mandatory rebuttable presumption does not remove the presumed element from the case if the State proves the predicate facts, but it nonetheless relieves the State of the affirmative burden of persuasion on the presumed element by instructing the jury that it must find the presumed element unless the defendant persuades the jury not to make such a finding. A mandatory rebuttable presumption is perhaps less onerous from the defendant's perspective, but it is no less unconstitutional.

471 U.S. at 316–17, 105 S.Ct. at 1972.

The Court further held that the concluding sentence in the above-quoted portion of the charge did not cure the constitutional problem, *inter alia*, because "language that merely contradicts and does not explain a constitutionally infirm instruction will not serve to absolve the infirmity." 471 U.S. at 322, 105 S.Ct. at 1975. In such a situation, a "reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." 471 U.S. at 322, 105 S.Ct. at 1975.

■ With this background, we turn to the present case. We focus initially on the specific language challenged, but our inquiry does not end there. 471 U.S. at 315, 105 S.Ct. at 1971. As the Court recently noted in *Estelle v. McGuire*, —— U.S. ——, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), "[i]t is well established that [an] instruction 'may not be judged in artificial isolation,' but must be considered in the context of

the instructions as a whole and the trial record." *Id.,* 112 S.Ct. at 482 (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). We must examine therefore the entire charge and record to determine whether other instructions might explain the particular infirm language to the extent that there was not a "reasonable likelihood" that the jury understood the charge to create an unconstitutional presumption.[3] *Id.,* 112 S.Ct. at 483.

### A.

Rock challenges the following portion of the supplemental jury charge:

[T]he intentional, unlawful, and fatal use of a deadly weapon against a vital part of the body gives rise to the presumption of fact that an intent to kill existed. This is a presumption of fact based on common knowledge that such use is almost certain to be fatal.

Every person is presumed to intend the natural and probabl[e] consequences of his act; but being a presumption of fact, it may be rebutted by other circumstances in the case, and whether it is so rebutted is a question for you to decide.

So what the law is on the subject is that if Mr. Rock intentionally, without justification, that means lawfully, did use a deadly weapon against a vital part of the body of the victim or victims, then that gives rise for you to consider that there is a presumption of fact that an intent to kill existed. Because we all know that such use is almost certain to be fatal.

On their face, these instructions relieved the State of a portion of its burden of proving each element beyond a reasonable doubt. The jury was here told that once the State proved the intentional use of a deadly weapon against a vital body part, the law presumed deliberation and premeditation unless other evidence showed their absence. The court instructed that the existence of the predicate fact "gives rise to the presumption" and that "[t]his *is* a presumption of fact." Moreover, the court's explanation of the rationale for the presumption, i.e., that "[e]very person is presumed to intend the natural and probabl[e] consequences of his act,"[4] reinforces precisely the message of the instructions censured in *Francis.*

Here as in *Francis,* the State stresses that the presumption was described as a rebuttable one. For the reasons explained by the Court in *Francis,* the fact that the presumption was said to be rebuttable makes it no less objectional from a constitutional perspective.

While we thus believe that the principles announced in *Francis* are applicable here as well, it is important to stress that the presumption described in *Francis* is a far different and potentially more prejudicial one than the presumption described to the jury in this case. In *Francis,* the victim had slammed his front door in the defendant's face while the defendant was holding a gun. The gun discharged and the bullet passed through the door before striking and killing the victim. The defendant testified that the gun had discharged accidentally. As the Court explained, the predicate fact in the challenged portion of the

---

**3.** Prior to *Estelle,* there was some ambiguity as to the appropriate standard of review for jury instructions. The Court first adopted the "reasonable likelihood" standard in *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). In two later opinions, the Court appeared to endorse an arguably different standard. *See Cage v. Louisiana,* — U.S. —, 111 S.Ct. 328, 329, 112 L.Ed.2d 339 (1990) ("In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole"); *Yates v. Evatt,* 111 S.Ct. at 1892 ("We think a reasonable juror would have understood the [instruction] to mean ..."). In *Estelle,* the Court "disapprove[d] the standard of

review language in *Cage* and *Yates,* and reaffirm[ed] the standard set out in *Boyde*." 112 S.Ct. at 482 n. 4.

**4.** Rock argues that the court's instructions involved two presumptions: one arising from the intentional use of a deadly weapon against a vital body part and one arising from any act of the defendant. In context, we believe a reasonable juror could only have understood the charge to convey a presumption arising from use of a deadly weapon. The court's references to the "natural and probable consequences" of an act and "common knowledge" served to explain the rationale for this presumption.

jury instructions was that the defendant did an act which resulted in the death of another (i.e., "the act of slaying another") and the fact to be presumed was that·the defendant intended that death (i.e., "intent to kill"). 471 U.S. at 316, 105 S.Ct. at 1972. Moving from this predicate fact to this presumed fact was a very material aid to the State in carrying its burden of proof since, in practical effect, it required the jury to reject the accidental discharge theory unless the defendant could point to evidence that established it.

Here the predicate fact was that the defendant formed an intent to shoot a deadly weapon at vital organs of Brookens and Cutchall. The fact to be presumed was that the defendant formed and executed an intent to kill them. Because instances in which an individual forms an intention to use a deadly weapon against a vital body part of another *without* intending to kill that person are at best exceedingly rare in human experience, a presumption of this kind will rarely be of significant benefit to the State. As we will see hereafter, the presumption clearly was of no benefit to the State in the circumstances of this case. Nevertheless, this portion of the charge was constitutionally infirm because it instructed the jury to assume an element of the offenses charged if the jury found the predicate fact to exist and no other evidence contradicted the presumed element.

### B.

Having determined that the challenged instructions isolated from their context were constitutionally infirm, we turn to examine the charge in its entirety. *Francis*, 471 U.S. at 322, 105 S.Ct. at 1975. The Commonwealth asserts that both the general instructions given to explain to the jury the concepts of presumption of innocence and reasonable doubt and the trial court's specific instructions with respect to intent sufficiently explain the erroneous instructions in a manner consistent with the Constitution. We disagree.

### 1.

■ Both the initial and supplemental charges contained general instructions relative to the State's burden of proof and the defendant's presumption of innocence.[5] These instructions, however, "do not dissipate the error in the challenged portion of the instructions." *Francis*, 471 U.S. at 320, 105 S.Ct. at 1974. The instructions fail to cure the constitutionally defective presumption for two reasons. First, as in *Francis*, these general instructions are not rhetorically inconsistent with the specific instructions on intent which create a burden-relieving presumption. *Francis*, 471 U.S. at 319, 105 S.Ct. at 1973; *Sandstrom*, 442 U.S. at 518–19 n. 7, 99 S.Ct. at 2456 n. 7. As the Court explained in *Sandstrom*, "[t]he jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied." 442 U.S. at 518–19 n. 7, 99 S.Ct. at 2456 n. 7. Second, we believe it far more likely that when considering the evidence regarding Rock's intent the jury

---

**5.** In its initial charge, for example, the trial court instructed the jury as follows:

If, however, your judgment of what the evidence proves and the inferences to be drawn from the facts established to your satisfaction differs from what is suggested by the attorneys or by the Court, you will follow your own judgment and not the suggestion of anyone else, including the attorneys or the Judge.

 \* \* \* \* \* \*

Furthermore, a defendant is presumed innocent throughout the trial and unless and until you conclude, based on a careful and impartial consideration of the evidence, that the Commonwealth has proven him guilty beyond a reasonable doubt; and of course, that applies as to each of these matters that you will be considering.

It is not the defendant's burden to prove that he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crime charged, or crimes charged, and that the defendant is guilty of that crime or crimes beyond a reasonable doubt. The person accused of a crime or crimes is not required to present evidence or prove anything in his own defense.

Tr. 692. In the supplemental charge, the court stated: "As we have said frequently, the Commonwealth must prove all of the elements of the crime charged." Tr. 767.

applied the instructions specifically directed to that subject matter rather than the more general instructions. *See Humanik*, 871 F.2d at 442 ("we believe it far more likely that the jurors when considering the evidence regarding mental disease or defect applied the instruction specifically directed to that subject matter than the more general charge.").

### 2.

■ As we have noted, the court in its supplemental charge attempted to restate the challenged presumption in a portion of the charge which commences with the clause "so what the law is on the subject" and which characterizes the presumption as something for the jurors "to consider" and apply if they "see fit." App. 31–32. We agree with the Commonwealth that the introductory language to this segment of the charge would indicate to the jury that it was about to hear an explanation of what had gone before. We also agree that this segment of the instructions suggested to the jury that it was not required to apply the presumption even if it found the predicate facts to exist beyond a reasonable doubt. This, however, does not solve the problem. While these phrases indicate that the presumption is not mandatory, they provide no criteria as to when the presumption should or should not be applied; consequently, it is impossible to determine whether the jury did or did not employ the presumption in deciding that the State had carried its burden of proof with respect to *mens rea*. Accordingly, we cannot say that the corrective language in the supplemental instructions cured the charge's constitutional defects.

■ Nor can we agree with the Commonwealth when it insists that the two charges, taken as a whole, simply instructed the jury that it could infer an intent to kill from all of the facts. In our view, neither the supplemental nor the initial instructions can fairly be read to communicate such a message. As for the supplemental instructions, they contain no explicit or implicit reference to inferring an intent to kill from the facts surrounding the

shootings. It is true that the original instructions on intent to kill directed the jurors to consider "every inference" and informed them that "intention is to be gathered from all of the circumstances surrounding the act." Nevertheless, the trial judge's concluding remark on the subject made clear that the jurors had *alternative* means of satisfying the requirement that the Commonwealth prove beyond a reasonable doubt that Rock intended to kill Brookens and Cutchall. In the judge's words, "a specific intent to take life [was] to be inferred from the facts, *or* rising [sic] out of the presumptions as we explained them to you." App. 10 (emphasis added). Where the trial court offers the jury two approaches, one of which is unconstitutional, and it is impossible to determine whether the jury took the unconstitutional path, a conviction cannot stand in the absence of a determination that the error was harmless beyond a reasonable doubt.

### IV.

■ Constitutional error in a jury instruction will not require a reversal of a criminal conviction if "it appears 'beyond a reasonable doubt that the error did not contribute to the verdict obtained.'" *Yates v. Evatt*, 111 S.Ct. at 1892 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). To say that an instruction to apply an unconstitutional presumption did not "contribute" to a jury's verdict is not to say that the jurors were totally unaware of the presumption, but rather, to find that the erroneous instruction was unimportant in relation to the other evidence considered by the jury independently of the presumption. *Yates*, 111 S.Ct. at 1893. The test, then, is "whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." *Id.* at 1893–94. Accordingly, we ask: Given the undisputed evidence and what the jury concluded based on the charge's errorless instructions, is it clear

beyond a reasonable doubt that the jury would have reached the same results if properly instructed regarding intent to kill?

In conducting our analysis, we "adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions." *Francis*, 471 U.S. at 324 n. 9, 105 S.Ct. at 1976 n. 9.

### A.

Once again we note the limited scope of the challenged presumption. By its own terms, the presumption could play no role in the jurors' deliberations unless and until they concluded that there had been an *"intentional ... use* of a deadly weapon against a vital part of" the victims' bodies. App. 30 (emphasis added). The trial judge took pains to emphasize this point with his admonition, "let me also remind you in your deliberations that I used *the word intentional* use of a deadly weapon against a vital part of the body." App. 31 (emphasis added). He went on to specifically point out that this meant the presumption would not apply unless the state had carried its burden of proving beyond a reasonable doubt that the act of aiming and shooting at a vital body part was the act of a sane person:

> [I]f Mr. Rock suffered from a mental disease and if he did not know the nature and quality of the act he performed ..., namely the use of the rifle and the aiming at a vital part of the body, or if he knew what he was doing but didn't know

it was wrong, then it could not be intentional. App. 31.

In light of these instructions, we know that if the jury gave any weight to the impermissible presumption, it must have first concluded beyond a reasonable doubt (1) that Rock was capable of forming a specific intent to aim his high-powered rifle at a vital organ of Brookens and Cutchall, (2) that he actually formed that intent, and (3) that he acted on it. Thus, we know, *inter alia*, that the jury could not have used the impermissible presumption without rejecting Rock's testimony that he was shooting at "moving objects" rather than at people.

Moreover, because of the above-quoted instruction concerning the relationship between the presumption and the sanity issue, we also know that the jury could not have relied upon the impermissible presumption without having first found Rock sane.[6] Thus, we may take as a given in our harmless error analysis that Rock understood the consequences of firing a deadly weapon at Brookens' heart and Cutchall's head and that he knew it was wrong to do so.

Rock's only other contention was that he suffered from diminished capacity. The situation with respect to this contention differs somewhat from the situation with Rock's insanity contention because there was no instruction expressly directed to the relationship between the presumption and diminished capacity,[7] and because the defense never articulated for the jury a theory of diminished capacity independent

6. The record provides other clear assurance of the jury's rejection of Rock's insanity defense. The court's charge included a mandate that the jury return a verdict of not guilty by reason of insanity on all counts if the state failed to prove sanity beyond a reasonable doubt. App. 737. The fact that the jury returned no such verdict establishes that the state carried its burden on this issue.

7. Rock objected after the supplemental charge to the court's failure to expressly address the relationship between the presumption and the diminished capacity defense. Although it might have been helpful for the court to do so, the court's omission falls far short of a due process

violation. The court gave an explanation of the diminished capacity issue that Rock has not challenged as unconstitutional. The fact that the court also charged on the presumption and illustrated its application by reference to the defendant's insanity defense takes nothing away from that explanation. Conversely, the existence of a diminished capacity issue provides no reason to believe that the jury applied the presumption, in violation of its terms, without first being satisfied beyond a reasonable doubt of the predicate fact. Thus, so far as the charge is concerned, we believe the sole remaining issue is whether the charge concerning the challenged presumption was harmless error.

of its theory of insanity. Nevertheless, we can say with confidence that the government secured no assistance with respect to this issue from the impermissible presumption.

■ As we have noted, the court's description of the predicate fact provides assurance that the presumption could not have been applied unless the jury was satisfied beyond a reasonable doubt that Rock had the capacity to formulate and carry out an intent to shoot his gun at the vital organs of the victims. We are unable to conceive of a situation in which a person would have this capacity and would fully understand the consequences of such firing but would nevertheless lack the required capacity to formulate an intention to kill. More important, neither Rock's psychiatrist nor his counsel has been able to posit such a situation, and nothing in this record suggests any reason why a rational jury would be moved to conceive of one. To the contrary, the undisputed evidence provides overwhelming confirmation of the natural and compelling inference to be drawn when a sane person intentionally shoots at the heart or head of another—the inference of an intent to kill. Rock's purchase of ammunition, his sighting his rifle, his setting fire to his house, his taking cover and waiting in the woods, his lethal discharge of his rifle, and his flight all speak eloquently to the fact that he purposefully planned the killing of his victims and therefore about his capacity to do so. Thus, the undisputed facts establish beyond peradventure that this was not a case in which the defendant was unable to fully formulate a purposeful scheme. On the contrary, this was a paradigm case of the willful, deliberate, and premeditated killing referred to in the Pennsylvania statute as killing by "lying in wait."

The overwhelming character of the evidence that Rock, if sane, intended to kill Brookens and Cutchall is reflected by the absence of any alternative explanation in the briefing and argument on his behalf. No alternative explanation was tendered to the jury or suggested in the briefing before this court. Rock's counsel did submit at

oral argument that Rock may have intended to frighten Brookens and Cutchall away from the burning cabin. This theory, however, falls woefully short of raising a reasonable doubt on the record of this case. When an expert marksman sights a high-powered rifle to assure its accuracy, fires a shot directly into the heart of another, sees the first victim fall, remains under cover, fires a second shot directly into the head of a second victim, still remains under cover, renews firing at others who appear thereafter, flees, and when captured, asks how many people he killed, the scare hypothesis is simply an untenable one.

This analysis alone would support a finding beyond any reasonable doubt that the jury would have returned the same verdict had it never heard the impermissible presumption. The record provides even more assurance, however, of the harmlessness of the trial judge's error.

### B.

The evidence at trial showed that the fire truck which arrived at the scene after Rock had shot Brookens and Cutchall carried six fire fighters. Robert Monn, the driver, and William Kady sat in the truck's front seat. Scott Reichenback and Richard Hade sat behind them in the jump seat. Two other fire fighters rode on the back of the truck.

As the truck approached, Rock fired several bullets through its windshield. Other bullets passed near the truck and its occupants. One bullet wounded Reichenback in the arm. Another either grazed or caused glass or metal fragments to graze Monn's arm. None of the other firemen suffered injuries as a result of the shootings.

The jury found Rock guilty of attempted murder with respect to all four of the fire fighters seated in the front and jump seats. It also found Rock guilty of aggravated assault with respect to the two fire fighters who rode on the back of the truck.

■ In Pennsylvania, attempted murder requires proof of intent to kill. *Commonwealth v. Griffin*, 310 Pa.Super. 39, 456 A.2d 171, 178 (1983). Consequently, the trial judge in this case instructed the

jury that in order to find Rock guilty of attempted murder, it would have to find that he acted "with the intent to commit the crime of murder." App. 728. Because the jurors found Rock guilty of attempting to murder Monn, Kady, Reichenback, and Hade, we know that they must have determined that Rock intended to kill all four men—of whom two sustained arm wounds and two suffered no injuries.

The trial judge's instructions regarding attempted murder mentioned no impermissible burden-relieving presumption. The court did refer generally to the instructions on murder, stating:

> You have just heard the crimes of murder defined to a considerable extent and their elements explained. So it is not necessary that I repeat that again, and you will be able to determine whether the defendant's conduct evidenced an intent to commit that crime....

Tr. 729. Even if we were to assume that this general reference to the murder instructions led the jurors to consider the infirm presumption during their deliberations on the attempted murder charges, it is clear that the presumption could not have affected their verdicts.

As noted above, by its own terms, the presumption could play no role in the jury's deliberations unless the Commonwealth established to the jury's satisfaction that Rock had formed and executed an intent to fire a deadly weapon against a vital body part. Because Rock did not use a deadly weapon against the vital body parts of the men whom he was convicted for having attempted to murder, the predicate facts necessary to give rise to the presumption were not established. Thus, assuming, as we must, that the jury followed the trial court's instructions, the presumption could not have led the jury to conclude that Rock attempted to murder Monn, Kady, Reichenback, or Hade.

Since the jury found without the aid of an impermissible presumption that Rock

intended to kill two men who were wounded in the arm and two men who sustained no injuries at all, it is apparent that the jury would have reached the same conclusion regarding Brookens and Cutchall's deaths even if the objectionable portions of the murder instructions had been eliminated. We fail to see how a rational juror could have inferred from the evidence that Rock intended to kill the four men who received minor wounds or no wounds but did not intend to kill the two men whom he shot in the heart and head. Thus, it is clear beyond a reasonable doubt that the objectionable portions of the jury instructions did not affect the first-degree murder verdicts.

## V.

■ Rock's second contention on appeal concerns the trial court's denial of his motion for a change of venue. Rock argues that the adverse publicity surrounding his trials compelled a venue change and that the trial court's refusal to grant his motion violated his Sixth Amendment right to a trial by an impartial jury.[8]

■ Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors. See *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). The community and media reaction, however, must have been so hostile and so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury. *United States v. De Peri*, 778 F.2d 963, 972 (3d Cir.1985); *see Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct.

---

8. Our standard of review for a state trial court's finding of juror impartiality in a federal habeas proceeding is "manifest error." *Mu'Min v. Virginia*, —— U.S. ——, 111 S.Ct. 1899, 1907, 114

L.Ed.2d 493 (1991) (citing *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2888, 81 L.Ed.2d 847 (1984)).

2290, 2303, 53 L.Ed.2d 344 (1977) (refusing to presume juror impartiality "in the absence of a 'trial atmosphere utterly corrupted ... by press coverage' ") (quoting *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975)). Such cases are exceedingly rare. *De Peri,* 778 F.2d at 972.

 In the absence of a showing of an "utterly corrupt" trial atmosphere, the defendant, in order to demonstrate a violation of his right to an impartial jury, must establish that those who actually served on his jury lacked a capacity to reach a fair and impartial verdict based solely on the evidence they heard in the courtroom. *Patton v. Yount,* 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2890, 81 L.Ed.2d 847 (1984) (citing *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *De Peri,* 778 F.2d at 972; *Martin v. Warden, Huntingdon State Correctional Institute,* 653 F.2d 799, 805 (3d Cir.1981). The fact that jury members may have been exposed to press reports or other community reaction concerning the case and even the fact that they may have formed a tentative opinion based on that exposure will not establish a constitutional violation if the trial court has found, with record support, that each of the jurors was able to put aside extrinsic influences.

### A.

██ Rock's trial court concluded that the publicity preceding his second trial had not created a community atmosphere so hostile and pervasive as to preclude a fair trial. That conclusion is amply supported in the record. Although there was extensive adverse publicity and community interest in Rock's case, both reached their peaks prior to Rock's first trial—four years before jury selection for the second trial. From the date of Rock's sentencing after the first trial until his conviction was over-turned, a period of 41 months, the local media in the Franklin County region published or broadcast a total of three stories relating to Rock's case. During the three-month period between the reversal of the conviction and the start of the second *voir dire,* the region's two papers carried a total of thirteen articles and the local radio stations reported an aggregate of eleven news stories. Nothing in the record suggests that these news accounts were unfair or sensationalistic. Nor does Rock argue that the media attention was the product of police or prosecutorial initiative. In short, the record does not reveal a "barrage of inflammatory publicity immediately prior to [Rock's] trial" which would give rise to a presumption of juror prejudice. *See Yount,* 467 U.S. at 1033, 104 S.Ct. at 2889 (quoting *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975)).

In addition to the media attention given his case, Rock relied on survey data as evidence of community attitudes shortly before his second trial. The survey purported to show that 93.7% of those interviewed had "heard of" Rock's case, and that 68% of that group believed Rock to be guilty. Like the district court, we have grave doubts as to the reliability of the survey's methodology and results.[9] More importantly, we believe that the transcript of the *voir dire* examination retrospectively confirms that community sentiment did not "utterly corrupt" the trial atmosphere.

"That time soothes and erases is a perfectly natural phenomenon, familiar to all." *Yount,* 467 U.S. at 1034, 104 S.Ct. at 2890. The effect of the "cooling off" period between the adverse publicity surrounding the killings and the start of Rock's second trial was evident from the *voir dire* testimony. Although most of the veniremen had heard about the case,[10] few could recall more than the most basic facts surrounding

---

9. For example, the survey's questions were phrased and the data were collated such that respondents who thought Rock had shot Brookens and Cutchall but was insane at the time were recorded as believing that Rock was "guilty." Exhibit IC, Transcript of Proceedings For Change Of Venue at 62.

10. Of the 50 veniremen asked whether they had heard about the case, 46 responded in the affirmative.

1254

the killings. *See, e.g.,* Exhibit IIA, Transcript of Proceedings at 41, 55, 61, 72–73, 105, 138–39, 222, 230, 233–34, 251, 264, 293–94, 349, 352–53, 393, 419–21, 464, 474, 530, 558. Moreover, 70% of those questioned had not formed an opinion as to Rock's guilt. Of this group, only six percent said that they could not set their impressions aside and render a verdict based solely on the evidence introduced at trial. By comparison, in *Yount,* where the Supreme Court rejected a state habeas petitioner's Sixth Amendment claim of jury impartiality, 77% of all of the questioned veniremen stated that they would carry into the jury box a fixed opinion as to the defendant's guilt. 467 U.S. at 1029, 104 S.Ct. at 2887.

### B.

Turning to the issue of whether Rock has demonstrated actual prejudice—that is, a juror unable to render a fair and impartial verdict based solely on the evidence—we agree with the trial court that Rock's evidence falls far short of the mark.[11] The *voir dire* transcript reveals that none of the seated jurors had formed an opinion as to Rock's guilt prior to the trial. All of the jurors testified that they could render a verdict based solely on the evidence at trial. We also note that eleven of the jurors were seated without challenge by Rock. *See De Peri,* 778 F.2d at 972 (citing as reason for court's rejection of defendant's claim of juror partiality the fact that ten of twelve jurors were seated without challenge). Rock did object to the seating of one juror, but not on the ground

that the juror in question was influenced by pre-trial publicity or community sentiment.[12] Our review of the record shows that the *voir dire* of this juror provided ample support for the trial court's conclusion that she had not made up her mind as to Rock's guilt or innocence and that she would be impartial.

Indeed, our review of the entire *voir dire* transcript reveals that the trial court conducted a patient and careful examination of the potential jurors and gave Rock's counsel wide latitude in his follow-up examination of the veniremen. *See, e.g.,* Exhibit IIA, Transcript of Proceedings at 48–51, 53, 128, 131–36, 258–59, 268–69, 273, 309–12, 344–47, 361–66, 459–61, 522–26. The transcript provides more than an adequate basis for sustaining the trial court's conclusion regarding the jury's impartiality. We thus find no merit in Rock's claim that his Sixth Amendment rights were compromised.

### VI.

Rock's final contention concerns the increased sentence he received after his retrial. Rock argues that his due process rights were violated when Judge Keller imposed a harsher sentence after the second trial. While it is far from clear that the time Rock will serve under his second sentence will be any different than he would have served under the first, Judge Keller and the Commonwealth, as well as Rock, have viewed the practical effect of the second sentence to be harsher and we have made that assumption in deciding this appeal.[13] Nevertheless, we conclude that

11. We note that the statutory presumption of correctness in federal habeas proceedings, *see* 28 U.S.C. § 2254(d), applies to a state court's determination that a particular juror could be impartial. The Court in *Yount* found "good reasons to apply the statutory presumption of correctness to the trial court's resolution of these questions" because "the determination has been made only after an extended *voir dire* proceeding designed specifically to identify biased veniremen" and because "the determination is essentially one of credibility, and therefore largely one of demeanor." 467 U.S. at 1038, 104 S.Ct. at 2892.

12. Rock objected to the juror because she was enrolled in a class taught by the prosecutor's law partner. Tr. 383. Rock did not contest in his omnibus post-trial motion the trial court's refusal to sustain his objection. Nor does he challenge the trial court's decision on appeal.

13. Throughout the period from 1977 to 1986, a life sentence in Pennsylvania carried no possibility of parole. In this context, two consecutive life sentences would appear no more onerous in practical effect than two concurrent life sentences. The parties and Judge Keller apparently believed, however, that Rock could reasonably hope for a commutation of his sentences

Judge Keller's sentence did not violate Rock's right to due process of law.

At Rock's second sentencing, his counsel told Judge Keller that Rock was going "to serve whatever [a life sentence] means in Pennsylvania" and that the only issue before the court was whether it was "going to run some consecutive terms on that." Transcript of Proceedings of Sentencing at 9. Counsel took the position that Judge Keller could not impose consecutive life terms because Judge Eppinger had not done so and because the trial record before Judge Keller was not materially different from that before Judge Eppinger. As counsel read *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), and its progeny, Judge Keller was free to impose a harsher sentence only if he could point to facts unknown to Judge Eppinger that would justify such a sentence. Judge Keller rejected this view:

> Mr. Rock, we do not agree with Mr. Rudovsky's analysis of the case he cited. We do not think that there is a prohibition against a court on a retrial and reconviction from reviewing the facts anew in determining what is an appropriate sentence under those facts. As we said, we do not know what went through Judge Eppinger's mind, whether he would have even understood the significance of zeroing in a rifle; but I do.

Tr. 15.

Judge Keller then went on to explain to Rock the disparity between his sentence and that of Judge Eppinger:

> Judge Eppinger did not impose consecutive sentences. That certainly was within his discretion. Whether it is with-

in my discretion to change that, I guess, only time will tell.

> I want to say to you that it has always been my position that crimes do not get cheaper by the dozen. You killed two people. It is absolutely an anomaly and illogical to me to think if you killed two, three, five, or ten that one life sentence is all you should serve; because there were two lives that were snuffed out. Similarly, there were four people that the jury concluded you attempted to murder and two that you committed aggravated assault with intent to do serious bodily injury to; and the Court simply sees no justification for the position that they should all be lumped together.

Tr. 18–19.

In his opinion on Rock's post-trial motions, Judge Keller noted that his "sole involvement in the first trial was to preside over a suppression hearing," and that he had read no part of the record of the proceedings prior to the retrial other than the opinion of the federal habeas corpus court. Opinion and Order at 9 (August 1, 1986).[14] We are thus presented with a situation in which a second sentencing judge, serving on the same court as the first sentencing judge, imposed a harsher sentence after retrial, explaining on the record that he had taken a fresh look at the case and had concluded that a more severe sentence was necessary in his judgment to reflect the seriousness of the offenses.

 Due Process "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *North Carolina v. Pearce,* 395 U.S. 711, 725, 89 S.Ct. 2072,

and that obtaining a commutation of consecutive sentences would be significantly more difficult than obtaining a commutation of concurrent ones.

**14.** Rock asserts in his brief that "Judge Keller and Judge Eppinger *jointly* heard argument and ruled on all of the post-trial motions, including the ineffectiveness claim which ultimately resulted in a new trial." Appellant's Brief at 25 (emphasis in the original). In fact, Judge Keller did not participate in the post-trial proceedings. *See* Transcript of post-trial hearing (November

8, 1979). Judge Keller's name was included along with Judge Eppinger's name on the title page of the court's Opinion and Order on Rock's post-trial motions (April 30, 1980). However, we understand Judge Keller's contribution to that opinion to be limited to Judge Eppinger's incorporation of Judge Keller's pre-trial opinion on Rock's suppression motion. *See* Opinion and Order at 7 ("We find that Judge Keller has correctly stated the law and that it was not error to refuse to suppress the statements; thus we incorporate his opinion filed May 9, 1978 in this opinion.").

2080, 23 L.Ed.2d 656 (1969). In order to assure the absence of a vindictive or retaliatory motivation, the Court held in *Pearce* that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear." *Id.* at 725–26, 89 S.Ct. at 2081. This requirement has been read to create "a presumption of vindictiveness, which may be overcome only by objective information in the record justifying the increased sentence." *United States v. Goodwin,* 457 U.S. 368, 374, 102 S.Ct. 2485, 2489, 73 L.Ed.2d 74 (1982). In *Pearce,* the Court indicated that the "objective information" relied upon must concern conduct of the defendant occurring after the first sentencing. 395 U.S. at 726, 89 S.Ct. at 2081. It is now clear that the *Pearce* presumption may be rebutted by an explanation of the second sentencer based upon information concerning conduct or events preceding the first sentencing so long as that information was not available to the judge imposing the first sentence. *Texas v. McCullough,* 475 U.S. 134, 141–44, 106 S.Ct. 976, 980–81, 89 L.Ed.2d 104 (1986). As Rock stresses, however, no Supreme Court case holds that an explanation like that of Judge Keller satisfies the record explanation requirement of *Pearce* where the doctrine of that case is applicable.

The case law decided since *Pearce* makes it clear that the presumption of vindictiveness does not apply in every case where a convicted defendant receives a heavier sentence on retrial. *Alabama v. Smith,* 490 U.S. 794, 799, 109 S.Ct. 2201, 2204, 104 L.Ed.2d 865 (1989); *McCullough,* 475 U.S. at 138, 106 S.Ct. at 978. Because the *Pearce* presumption "may operate in the absence of any proof of an improper motive and thus ... block a legitimate response to criminal conduct," the Court has limited its application to circumstances where there is a "reasonable likelihood" that the increase in sentence resulted from actual vindictiveness on the part of the sentencing authority. *Alabama v. Smith,* 490 U.S. at 799, 109 S.Ct. at 2204 (quoting *Goodwin,* 457 U.S. at 373, 102 S.Ct. at 2488). *See also Blackledge v. Perry,* 417 U.S. 21, 27, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974) (due

process "is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of 'vindictiveness.'"). As the Court emphasized in *McCullough,* "vindictiveness of a sentencing judge is the evil the Court sought to prevent [in *Pearce*] rather than simply enlarged sentences after a new trial.... Accordingly, in each case, we look to the need, under the circumstances, to 'guard against vindictiveness in the resentencing process.'" 475 U.S. at 138, 106 S.Ct. at 979 (quoting *Chaffin v. Stynchcombe,* 412 U.S. 17, 25, 93 S.Ct. 1977, 1982, 36 L.Ed.2d 714 (1973)).

The Court found no need to guard against vindictiveness in *Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), where the defendant's enhanced sentence was imposed by a second court in a two-tier system in which a defendant convicted of a misdemeanor in an inferior court had the right to a trial *de novo* in a superior court. 407 U.S. at 105–06, 92 S.Ct. at 1954–55. In refusing to apply the *Pearce* presumption, the Court reasoned that a trial *de novo* was "not an appeal on the record," but "represent[ed] a completely fresh determination of guilt of innocence" by a tribunal that was not being "asked to do over what it thought it had already done correctly." 407 U.S. at 117, 92 S.Ct. at 1960.

Similarly, in *Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973), the Court found the *Pearce* presumption inapplicable where, after a defendant's retrial following a successful appeal, a second jury imposed a lengthier sentence than the defendant received from a prior jury. The Court reasoned that a second jury, "unlike a judge who has been reversed, will have no·personal stake in the prior conviction and no motivation to engage in self-vindication." 412 U.S. at 27, 93 S.Ct. at 1983. It noted further that a jury "is unlikely to be sensitive to the institutional interests that might occasion higher sentences by a judge desirous of discouraging what he regards as meritless appeals." *Id.*

The Court employed a similar rationale in *McCullough*. The defendant in *McCullough* was sentenced to twenty years imprisonment by a jury after his initial murder conviction. The trial judge subsequently granted the defendant's motion for a new trial on the basis of prosecutorial misconduct. The same judge presided over the defendant's retrial, after which a jury again returned a guilty verdict. This time, however, the defendant elected to have his punishment imposed by the trial judge, who then sentenced the defendant to fifty years imprisonment. Although the judge expressly justified the increased sentence by pointing to the testimony of two new witnesses at the retrial, she candidly acknowledged that "had she fixed the first sentence, she would have imposed more than 20 years." 475 U.S. at 136, 106 S.Ct. at 978.

In upholding the defendant's second sentence, the Court reasoned that a trial judge who had granted the defendant's motion for a new trial would have " 'no motivation to engage in self-vindication,' " and that "[i]n such circumstances, there is also no justifiable concern about 'institutional interests that might occasion higher sentences....' " 475 U.S. at 139, 106 S.Ct. at 979 (quoting *Chaffin*, 412 U.S. at 27, 93 S.Ct. at 1983).

The *McCullough* Court then provided an alternative, independent basis for finding the *Pearce* presumption inapposite:

> The presumption is also inapplicable because different sentencers assessed the varying sentences that McCullough received. In such circumstances, a sentence "increase" cannot truly be said to have taken place. In *Colten v. Kentucky, supra*, which bears directly on this case, we recognized that when different sentencers are involved,
>
> > [i]t may often be that the [second sentencer] will impose a punishment more severe than that received from the [first]. But it no more follows that such a sentence is a vindictive penalty for seeking a [new] trial than that the [first sentencer] imposed a lenient penalty." *Id.*, 407 U.S. at 117, 92 S.Ct. at 1960–61.
>
> Here, the second sentencer provides an on-the-record, wholly logical, nonvindictive reason for the sentence. We read *Pearce* to require no more, particularly since trial judges must be accorded broad discretion in sentencing, see *Wasman, supra*, at 563–564 [104 S.Ct. at 3220].

475 U.S. at 140, 106 S.Ct. at 980 (ellipses in the original).[15]

■■■ We read *Colten, Chaffin*, and the quoted portion of *McCullough* to stand for the proposition that the *Pearce* presumption does not apply where the second sentence is imposed by a different sentencer and the record provides affirmative assurance that the harsher sentence reflects simply a fresh look at the facts and an independent exercise of discretion.[16] Thus, where a judge who imposes the second sentence has no material contact with the initial trial or sentence and "provides an on-the-record, wholly logical, non-vindictive

---

**15.** The *McCullough* court went on in a subsequent section of its opinion to hold that, were *Pearce* applicable, the judge's reference to the testimony of new witnesses at the second trial would satisfy the requirements of that case. All of the above-quoted text thus relates to the court's initial holding that the *Pearce* presumption was inapplicable and, in this context, it seems clear that the reference to an "on-the-record reason" is not limited to a reason that would rebut the *Pearce* presumption.

**16.** The quoted portion of *McCullough* has been read more broadly by at least one commentator to indicate that the *Pearce* presumption is inapplicable whenever the judge who imposed the second sentence had no reason to indulge in self-vindication. *See* W. LaFave & J. Israel, *Criminal Procedure,* § 26.1 at 76–78 (Supp. 1991). If one reads *McCullough* in this fashion, *Pearce* is clearly inapplicable here because Judge Keller did not preside at the initial trial, did not impose the initial sentence and had nothing to do with any error identified by the habeas court. While Judge Keller did preside over a suppression hearing prior to the first trial, the district court in Rock's first habeas proceeding rejected Rock's argument that Judge Keller had improperly refused to grant the motion to suppress. *See Rock v. Zimmerman*, 543 F.Supp. 179, 190–91 (M.D.Pa.1982). Thus, Judge Keller had no motive to engage in self-vindication. Like the judge in *Colten*, he was not asked to do over anything which he thought he had already done correctly.

reason for the harsher sentence," it is not necessary for him or her to invoke facts not available at the time of the first sentence. In this case, Judge Keller explained that the sentence disparity was attributable to the fact that he, like the judges in *Colten* and *McCullough*, was taking a fresh look at the relevant facts and exercising an independent judgment. His entirely plausible explanation for his sentence, together with the fact that Judge Keller had no material contact with the first proceeding, provide adequate assurance of an absence of vindictiveness.

Since Rock is not aided by the *Pearce* presumption, we will sustain his sentence absent proof of actual vindictiveness. *Alabama v. Smith*, 490 U.S. at 799–800, 109 S.Ct. at 2204–05 (citing *Wasman v. United States*, 468 U.S. 559, 569, 104 S.Ct. 3217, 3223, 82 L.Ed.2d 424 (1984)). Rock argues that "it is not even necessary to rely on the presumption of vindictiveness since the trial court's actual sentence—which is patently excessive—shows an unfair retribution for the successful appeal." Appellant's Brief at 25. We reject, however, the idea that two consecutive life sentences for two murders committed in the premeditated, willful, and deliberate manner in which Rock killed Wilbur Brookens and James Cutchall is "patently excessive." Since Rock presented no other evidence in support of his claim that Judge Keller acted with actual vindictiveness, his sentence must stand.

## VII.

The order of the district court will be affirmed.

GREENBERG, NYGAARD and ALITO, Circuit Judges, concur in the judgment of the court and join all of this opinion other than Section III.

MANSMANN, Circuit Judge, concurring and dissenting.

I remain convinced that the improper charge to the jury cannot be dismissed as harmless error and so dissent from Part IV of the opinion of the Court. Because the jury clearly struggled with the improper presumption and was repeatedly misinstructed by the trial judge, I cannot agree that "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). I concur in the majority's conclusion that the charge was erroneous as a matter of law; I would not reach the venue and sentencing issues.

## I.

The majority asserts that the evidence in support of the first degree murder verdict was overwhelming and rendered the unconstitutional presumption harmless error. It is unwise, however, to infer that the jury made a finding of specific intent from the jury's finding of sanity combined with its use of the improper instruction. By positing both that the jury could not have found Rock sane and free from diminished capacity and that the jury employed the improper presumption to find that Rock did not intend to kill Brookens and Cutchall, the majority effectively relieves the Commonwealth of its burden of proving specific intent, an element required for first degree murder regardless of a threshold finding of sanity. Although I would agree with the majority that the jury *may* have found as it posits, I am simply unconvinced beyond a reasonable doubt that the jury did so find.

The circumstantial evidence of Rock's specific intent to murder Brookens and Cutchall was less than overwhelming. To prove first degree murder, the Commonwealth must prove "an intentional killing," defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(d) (Purdon's 1983). Although I concede that the evidence would have supported an inference of specific intent, I dispute the majority's conclusion that the jury was left with no rational alternative on that question.

The defense expert witness, Dr. Emanuel Tanay, testified that he believed Rock's

acts of setting fire to his home and murdering the two victims did not constitute behavior "acceptable" to Rock, and was "contrary to his past history and contrary to his wishes." Dr. Tanay further opined that Rock acted "as if he was responding to some delusions ... re-enacting something." Tr. at 505. There was ample evidence to support the factual components of Tanay's theory. Rock had demonstrated great interest and pride in his home, purchasing items for landscaping and paying his mortgage just hours before setting his home on fire. The record shows an absence of any evidence that Rock had previous brushes with the law or that he harbored any motive beyond his general frustration with his life. Indeed, there was no evidence that Rock harbored a particular malice toward these specific victims.

Rock testified that he unsuccessfully ransacked his home and shed looking for a magazine pouch, then doused the structures with gasoline and set them on fire in a state of agitation and confusion. Tr. 421–22. Rock further testified that after hearing shots and explosions that frightened him,[1] he ran to the rear of his burning home and began shooting "at anything that moved." Tr. 427–29. He expressly denied any knowledge of shooting, or intent to shoot, at people. Tr. 429.

It is noteworthy that the District Attorney conceded in his summation that the evidence of intent was circumstantial; he argued that the jury should *infer* specific intent from Rock's actions. Tr. 667. Certainly the jury could have *inferred* specific intent; I am concerned only that the jury may have relied upon the unconstitutional presumption.

## II.

Much of the majority's harmless error analysis relies upon its reading of the presumption. Thus, the majority interprets the word "intentional" to modify both the "use of a deadly weapon" and "against a vital part of the body" predicates. This reading is essential to the majority's harm-

less error analysis, because if "intentional" relates solely to the predicate "use of a deadly weapon," then the presumption may have been applied without the predicate finding that Rock possessed specific intent to kill the victims. This latter understanding would be consistent with Rock's testimony that he believed he was shooting at moving objects but lacked any intention to shoot at people. If this is so, the jury may have applied the improper presumption in arriving at its conclusion that Rock committed a "willful, deliberate and premeditated murder."

After some deliberation, the jury posed questions concerning insanity and diminished capacity and asked, significantly, "Explain intent in regards to the hitting of a vital organ." The question itself reveals that the jury recalled and puzzled over the precise language of the improper presumption. More importantly, in answer to this question the trial court reiterated the improper presumption but on this occasion failed to include any qualifying language. In fact, the trial court made matters worse by adding another presumption: "Every person is presumed to intend the natural and probabl[e] consequences of his act...." Armed with these improper instructions, the jury resumed deliberations and returned a guilty verdict only ninety minutes later. This reiteration served to reinforce an unconstitutional presumption that was not countermanded by curative instructions or the weight of the evidence. *See Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

The verdicts of guilty for the attempted murder counts do not assuage my concern in this regard. The jury was invited to deliberate on the attempted murder charges *after* the murder charges by virtue of the sequence of the trial judge's charge. Moreover, the trial judge incorporated by reference the improper presumption on the murder counts into the instructions on the attempted murder counts. The majority's reasoning, while intellectually persuasive,

---

1. There was testimony to support the theory that some of those explosions would have been consistent with the burning of ammunition left inside the burning structures.

does not satisfy my concern that the jury may have followed the sequence of the trial judge's instructions and simply determined that failure to kill the attempted murder victims warranted conviction on those counts.

For these reasons, I respectfully dissent from Part IV of the opinion of the Court. Circuit Judge COWEN agrees with this concurring and dissenting opinion.